**2023 UT 10**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee*,

*v.*

TORREY JORDAN GREEN,
*Appellant*.

No. 20190336
Heard: October 5, 2022
Filed Jun 1, 2023

On Direct Appeal

First District, Brigham City
The Honorable Brian G. Cannell
No. 181100491

Attorneys:

Sean D. Reyes, Att'y Gen., Nathan Jack, David A. Simpson, Asst. Solics. Gen., Salt Lake City, Barbara K. Lachmar, Cache County, for appellee

Emily Adams, Freyja Johnson, Cherise Bacalski, Bountiful, for appellant

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which ASSOCIATE CHIEF JUSTICE PEARCE, JUSTICE PETERSEN, JUSTICE HAGEN, and JUSTICE POHLMAN joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

### Introduction

¶1 Torrey Green was charged with sexually assaulting seven women. On his lawyer's motion, six of the seven cases were consolidated for trial.[1] A jury convicted Mr. Green of charges for each of these six victims.

---

[1] The case that was not consolidated is not at issue in this appeal.

¶2 Mr. Green seeks a reversal of his convictions, arguing that he did not receive a fair trial. He advances four main arguments on appeal. First, he argues that under the Utah Rules of Evidence—specifically, rules 404(b) and 403—and the doctrine of chances, the district court erred in allowing the State to use evidence of conduct unrelated to a particular victim's case (other-acts evidence) to show that he sexually assaulted that victim. Relatedly, both he and the State ask us to overturn our doctrine-of-chances precedent. Second, Mr. Green asserts that the district court admitted hearsay statements that are prohibited by the Utah Rules of Evidence. Third, he offers several ways in which he claims his counsel rendered ineffective assistance at trial. Finally, he maintains that the cumulative error doctrine requires us to reverse his convictions.

¶3 Upon review of the parties' arguments concerning the doctrine of chances, we are persuaded that the doctrine should be abandoned in favor of a plain-text reading of rules 402, 403, and 404(b). Because of this change in course, we analyze whether the district court erred in admitting the other-acts evidence in Mr. Green's case under the rules of evidence (without any reference to the doctrine of chances). Under this standard, we find no error in the district court's other-acts evidence determination.

¶4 As to Mr. Green's hearsay claims, we conclude that most of the statements at issue were properly admitted consistent with exemptions to the hearsay rule. And because the evidence against Mr. Green was overwhelming, we conclude that the district court's errors in admitting those few statements that should have been excluded as hearsay were harmless.

¶5 We further conclude that Mr. Green's ineffective assistance of counsel arguments fail. None of these arguments satisfies the standard articulated for such cases by the United States Supreme Court and our caselaw.

¶6 Finally, based on our analysis of Mr. Green's other challenges, his cumulative error argument also fails. We accordingly affirm each of Mr. Green's convictions.

**Background[2]**

¶7 The State charged Mr. Green with the sexual assault and rape of M.H., L.P., C.H., C.D., A.P., and V.S. Each of these six women identified Mr. Green as her assailant, and the State filed charges against him for each alleged crime.

¶8 Based on the similarities among the six accounts, the State relied on rule 404(b) of the Utah Rules of Evidence and the doctrine of chances to introduce the testimony of all six women with respect to each of the charges, seeking to demonstrate that the six women were not fabricating their claims, as alleged by Mr. Green. The testimony was admitted for each of the six victims. Upon admission of this evidence, Mr. Green's attorney moved to consolidate the six cases, and the motion was granted.

¶9 During the trial, defense counsel stipulated to a summary of three *Salt Lake Tribune* articles (Tribune Articles) that described the alleged sexual assaults of several of the women. The written summary and stipulation were admitted into evidence as an exhibit (Tribune Stipulation), which the jury was permitted to possess during its deliberations.

¶10 After a ten-day trial, Mr. Green was convicted of raping M.H., C.H., C.D., V.S., and A.P. He was also convicted of the object rape and forcible sexual abuse of V.S. and of the sexual battery of L.P. The jury acquitted Mr. Green of four charges: the kidnapping of L.P., the forcible sexual abuse of L.P., the object rape of C.H., and the forcible sexual abuse of C.H.

¶11 Mr. Green filed a timely appeal, challenging the district court's decision to admit the other-acts testimony under the Utah Rules of Evidence and the doctrine of chances. He also challenges the district court's admission of hearsay evidence and its decision to allow certain documentary exhibits (including the Tribune Stipulation) to accompany the jury into its deliberations. Mr. Green further argues that his counsel was ineffective in moving to consolidate the six cases, agreeing to the Tribune Stipulation and permitting it and other exhibits to accompany the jury in its deliberations, not objecting to the State's admission of hearsay

---

[2] *State v. Heaps*, 2000 UT 5, ¶ 2, 999 P.2d 565 ("When reviewing a jury verdict, we examine the evidence and all reasonable inferences in a light most favorable to the verdict, reciting the facts accordingly.").

evidence, and failing to object to the "improper racial theme" allegedly created by the State at trial. Mr. Green also argues that, when viewed cumulatively, the district court's errors require us to reverse his convictions.

¶12 Because analyzing these issues requires a basic understanding of the underlying case, we begin by outlining Mr. Green's history at Utah State University (USU) and the publication of the Tribune Articles. Next, we analyze the testimony of the six victims as well as the associated hearsay testimony provided by their colleagues to rebut a claim of recent fabrication. Then, we discuss the alleged racial theme created at trial. And finally, we describe the procedural history of the case.

*A. Mr. Green's Football Career and the Publication of the Tribune Articles*

¶13 Mr. Green began studying at USU in 2011. He chose to attend USU because the university recruited him to play football, which he did collegiately from 2011 to 2016. On March 5, 2016, Mr. Green left USU to begin training camp with the National Football League and was subsequently drafted by the Atlanta Falcons.

¶14 Soon thereafter, on July 21, 2016, the *Salt Lake Tribune* printed an article reporting that an unnamed male who attended USU had been accused of committing several sexual assaults. The article discussed V.S.'s and A.P.'s allegations and included details of their alleged rapes. On August 4, 2016, the *Salt Lake Tribune* published a second article, this time identifying Mr. Green as the unnamed male. After the second article was published, the Atlanta Falcons cut Mr. Green from the team. On October 9, 2016, the *Salt Lake Tribune* printed a third article, which repeated the allegations of V.S. and A.P. and reported further allegations by M.H. and L.P. Not long after the publication of the third Tribune Article, the State brought charges against Mr. Green.

*B. The Rape of M.H.*

¶15 At Mr. Green's trial, M.H. testified that in November 2013, Mr. Green raped her. She met Mr. Green on Tinder, a dating app, and he invited her to his apartment for dinner. After dinner, Mr. Green offered to give her a massage, to which she agreed. During the massage, he tried to take her clothes off, but she resisted, telling him to stop. Eventually, Mr. Green forced her clothes off, stating, "[Y]ou'll like it. It's going to be fun." Mr. Green then proceeded to rape her. After it was over, M.H. drove herself home.

¶16 To support M.H.'s allegations, the State called four other witnesses—M.H.'s on-again-off-again boyfriend, A.W., A.W.'s

cousin (A.W.'s Cousin), and two of M.H.'s friends, A.H. and N.M. All four individuals testified concerning what they had heard about the rape. In support of its case, the State also submitted into evidence a poem that M.H. wrote about the rape shortly after it occurred.

¶17 A.W. stated that M.H. came to his house in November or December 2013 to talk. He testified that she told him "she had been with [Mr. Green], and that they had sex, but she didn't want to, that he had forced it on her and . . . that she said no." Defense counsel did not object to A.W.'s testimony.

¶18 A.W.'s Cousin subsequently testified that in November or December 2013, A.W. told him that he had heard that M.H. "had been raped by a USU athlete." Defense counsel did not object to A.W.'s Cousin's testimony. Finally, both A.H. and N.M. testified that in the summer of 2016, M.H. told both of them that Mr. Green had raped her. Defense counsel also did not object to A.H.'s or N.M.'s testimony.

¶19 The State submitted a poem that M.H. wrote "right after" the rape, which she posted on social media approximately ten days later. The poem used explicit language describing what occurred and its effect on M.H. Defense counsel objected to the poem's admission. The court overruled the objection and allowed the poem into evidence under the present sense impression exception in rule 803 and the residual exception in rule 807 of the Utah Rules of Evidence.

*C. The Sexual Battery of L.P.*

¶20 L.P. testified that in October 2014, Mr. Green sexually assaulted her with her clothes on. She explained that she met Mr. Green on Tinder, and he invited her to his apartment to watch a movie. Mr. Green tried to hold her hand, cuddle with her, and kiss her, but she rebuffed his advances, telling him that she did not want to do those things. After Mr. Green continued to make advances, she attempted to leave, but he cornered her, made comments about her body, and then grabbed her and simulated sex by rubbing his body against hers. She continued to resist, and eventually Mr. Green stopped and took her home.

¶21 To support L.P.'s allegations, the State called four witnesses—L.P.'s three roommates at the time of the incident, K.E., M.J., and S.S., and L.P.'s mother, K.P. All four witnesses testified regarding what L.P. told them about the assault.

¶22 K.E. testified that in October 2014, L.P. told her that Mr. Green had "tried to kiss her and held her down" and "that she didn't want it." Defense counsel objected to this testimony, but the court

overruled the objection under the excited utterance exception of rule 803 of the Utah Rules of Evidence. M.J. testified that in October 2014, L.P. told her that Mr. Green had "tried to push her up against the bed." And S.S. testified that in October 2014, L.P. told her that Mr. Green had "tried to rape her." Defense counsel did not object to either M.J.'s or S.S.'s testimony.

¶23 K.P. testified that in October 2014, L.P. called her and told her that she had been on a date with Mr. Green and that during the date, she was "basically raped with [her] clothes on." Defense counsel objected to K.P.'s testimony on hearsay grounds, but the court overruled the objection and permitted the testimony under the excited utterance hearsay exception of rule 803.

### D. The Rape of C.H.

¶24 C.H. testified that in the fall of 2015, she was raped by Mr. Green. She explained that she met Mr. Green on Tinder, and he invited her over to his apartment to watch a movie. During the movie, they started kissing, and Mr. Green tried to put his hands under—and then take off—her clothes. She told him to stop and pushed his hands away, but Mr. Green ignored her, saying things like, "You know you'll like this." He then forced her clothes off and proceeded to rape her. She continued to resist and eventually succeeded in pushing Mr. Green off of her. She then got dressed and drove herself home.

¶25 To support C.H.'s allegations, the State called her sorority sister, A.N., to testify. A.N. testified that in October 2015, C.H. told her that a USU football player had raped her—though at the time, C.H. did not disclose the football player's name. A.N. also testified that sometime in 2016, after the second Tribune Article, which identified Mr. Green, was published, C.H. disclosed to her that Mr. Green was the one who had raped her. Defense counsel did not object to A.N.'s testimony.

### E. The Rape of C.D.

¶26 C.D. testified that in October 2014, she was raped by Mr. Green. She explained that after she met Mr. Green at the USU student center, they began texting, and Mr. Green invited her over to his apartment to eat dinner and watch a movie. Because she did not have a car, Mr. Green picked her up and brought her to his apartment. While they were watching the movie, they began kissing. Mr. Green then started to touch her body, even though she repeatedly requested that he stop. Despite her resistance, Mr. Green held her down and then proceeded to rape her, saying, "I know you

want it." After it was over, C.D. had Mr. Green drive her to the on-campus dormitory building where her friend lived.

¶27 To support C.D.'s allegations, the State called two witnesses, C.D.'s friend (C.D.'s Friend) and C.D.'s mother, A.D. Both testified regarding what C.D. had told them about the rape. The court also admitted into evidence an essay that C.D. wrote about the experience.

¶28 C.D.'s Friend testified that in the fall of 2014, C.D. came to his house late one night to talk to him. He claimed that she had communicated to him that someone had "pinned her down" and "forced [him]self on her." Defense counsel did not object to C.D.'s Friend's testimony. C.D.'s mother, A.D., testified that in the fall of 2015, C.D. told her that she had been raped while at USU in 2014. She also testified that in 2016, after the *Salt Lake Tribune* published an article identifying Mr. Green as an alleged rapist, C.D. named Mr. Green as the individual who had raped her. Defense counsel did not object to A.D.'s testimony.

¶29 The court also admitted into evidence an essay that C.D. wrote in October 2014. In this essay, C.D. described her experience as a rape victim and detailed what had occurred on the night the rape took place. Defense counsel did not object to the admission of the essay.

*F. The Rape of A.P.*

¶30 A.P. testified that in June 2015, she was raped by Mr. Green. She explained that she met Mr. Green on Tinder, and he invited her to his apartment. She refused his invitation, so Mr. Green said he would come to her apartment instead. Initially, she told him that she did not want him to come over, but when he showed up, she decided to let him in for a few minutes. After talking for a while, she asked Mr. Green to leave so she could go to bed. Mr. Green then kissed her. Thinking Mr. Green was saying good night, she kissed him back for a moment but made it clear that it was time for him to leave. Mr. Green ignored her and, despite her opposition, followed her into her bedroom, complimenting her body. Mr. Green then held her down, pulled off her clothes, and began raping her, saying that she "would like it." After it was over, Mr. Green fell asleep, and she locked herself in the bathroom until the next morning, when Mr. Green left.

¶31 To support A.P.'s allegations, the State called two witnesses—her boyfriend, B.H., and a USU official, J.E., to testify regarding what A.P. had told them.

¶32 B.H. testified that A.P. came to him in July 2015 and told him she had been raped. He also testified that soon thereafter, A.P. identified Mr. Green as her assailant. Defense counsel objected to B.H.'s testimony on hearsay grounds, but the court overruled the objection, stating that the testimony "relates to timeline as well as setting the stage for context with respect to the alleged impact and condition of the alleged victim following the disclosure."

¶33 J.E., an officer in USU's Sexual Assault and Anti-Violence Office, testified that on November 6, 2015, A.P. told her that Mr. Green had raped her. The State offered this testimony "for the purpose of showing the effect on the listener" because J.E. provided services for A.P. as a result of their conversation. Defense counsel did not object to the testimony "for that limited purpose."

*G. The Rape of V.S.*

¶34 V.S. testified that in January 2015, Mr. Green raped her. She explained that she met Mr. Green at the USU student center and a few days later, he invited her to his apartment. She told Mr. Green that she didn't want to go to his apartment, but he drove to her apartment to pick her up anyway. Because Mr. Green had a friend with him, V.S. decided that she would go with them to Mr. Green's apartment. Shortly after they arrived at Mr. Green's apartment, the friend left. Mr. Green then started kissing V.S. and tried to take her clothes off. She told him not to, but he ignored her and carried her into his bedroom. Mr. Green then forced her clothing off and proceeded to rape her, saying, "Tell me how you like it." Mr. Green then asked for a massage and fell asleep. V.S. then called a friend to pick her up.

¶35 To support V.S.'s allegations, the State called three witnesses—her roommate, K.A., her resident advisor, R.B., and her ecclesiastical leader, R.M. All three witnesses testified regarding what V.S. told them about the rape.

¶36 K.A. testified that around 10:00 or 11:00 p.m. on the night of the rape in January 2015, V.S. woke her up and told her that Mr. Green had raped her. Defense counsel did not object to K.A.'s testimony. R.B. then testified that V.S. woke her late one night in January 2015 and told her that "she had been raped while she was hanging out with [Mr. Green]." Defense counsel did not object to R.B.'s testimony. R.M. then testified that one evening in January 2015, he met with V.S., and she told him that "she had been grabbed and physically constrained and then been raped." Defense counsel objected to R.M.'s testimony, but the district court overruled the

objection and allowed the testimony to "show the effect on the listener" because R.M. subsequently counseled and comforted V.S.

### H. The Alleged Improper Racial Theme

¶37 Mr. Green points to three instances of what he asserts to be improper references to race at trial. First, M.H. testified that "[Mr. Green] said he really likes black girls because they are really sassy, and if you try to have sex with them, you can't." M.H. testified that Mr. Green made this statement shortly after raping her. Second, A.P. testified that as a result of Mr. Green raping her, she developed symptoms of PTSD, including "not [being] able to be around black men at all" because when she is in their presence, she has a "full-on panic attack." And third, in its opening and closing arguments, the State described the women as "young," "naïve," and "innocent" girls while describing Mr. Green as a "big, old, fast linebacker" who was a "wolf in sheep's clothing" and who took the women back to his "lair."

### I. The Proceedings Below and Mr. Green's Defense

¶38 The State charged Mr. Green separately with respect to each of the six women. It charged him with the kidnapping and forcible sexual abuse of L.P.; the rape, object rape, and forcible sexual abuse of V.S. and C.H.; and the rape of A.P., M.H., and C.D.

¶39 In his defense, Mr. Green argued that each of the six women had lied about her encounter with him. He claimed they did so for various reasons, including because they hoped to "repair a relationship," wanted "money" and "attention," sought a way to get "help with . . . grades" (through an academic accommodation), needed "an excuse" for "breaking curfew," or were "upset about not getting another date."

¶40 As the cases proceeded, the State moved under rule 404(b) of the Utah Rules of Evidence to have all six women's allegations admitted at all six trials to rebut Mr. Green's defense that the women fabricated their testimonies. After reviewing the evidence under the Utah Rules of Evidence and the doctrine of chances, the district court granted the motion. Defense counsel then moved to consolidate all six trials into one. The district court granted the motion and consolidated the cases. The trial for the consolidated case lasted ten days. Mr. Green was convicted on eight counts and acquitted of four. He was convicted of raping M.H., C.H., C.D., V.S., and A.P. He was also convicted of the object rape and the forcible sexual abuse of V.S. and of the sexual battery of L.P. He was acquitted of the kidnapping of L.P., the forcible sexual abuse of L.P., the object rape of C.H., and the forcible sexual abuse of C.H.

¶41 Mr. Green appealed. We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(i).

## Standard of Review

¶42 We address four issues in this appeal: (1) whether the district court erred in admitting the other-acts evidence, (2) whether the district court erred in admitting hearsay evidence, (3) whether defense counsel was ineffective at trial, and (4) whether Mr. Green's convictions should be reversed for cumulative error.

¶43 The appropriate standard of review for a district court's decision to admit or exclude evidence is "abuse of discretion."[3] A district court abuses its discretion when it admits or excludes "evidence under the wrong legal standard."[4] "[W]hether the district court applied the proper legal standard in assessing the admissibility of . . . evidence is a question of law that we review for correctness."[5] If the district court applies the correct legal standard, it abuses its discretion only when "its decision to admit or exclude evidence is beyond the limits of reasonability."[6]

¶44 "An ineffective assistance of counsel claim raised for the first time presents a question of law."[7]

¶45 Before reversing a verdict or sentence under the cumulative error doctrine, we review each claim of error to determine whether "(1) an error occurred, (2) the error, standing alone, has a conceivable potential for harm, and (3) the cumulative effect of all the potentially harmful errors undermines [our] confidence in the outcome."[8] If we determine "that either a party's claim did not amount to an error, or that the claim was an error but has no potential to cause harm on its own, the claim cannot weigh in favor of reversal under the cumulative effects test."[9]

---

[3] *See State v. Cuttler*, 2015 UT 95, ¶ 12, 367 P.3d 981.

[4] *See id.*

[5] *Id.* (cleaned up).

[6] *Id.* (cleaned up).

[7] *Wyatt v. State*, 2021 UT 32, ¶ 11, 493 P.3d 621 (cleaned up).

[8] *State v. Martinez-Castellanos*, 2018 UT 46, ¶ 42, 428 P.3d 1038.

[9] *Id.*

**Analysis**

¶46 On appeal, Mr. Green asks us to reverse his convictions. He contends that the district court abused its discretion and that his counsel was ineffective in various ways. He first challenges the district court's admission of other-acts evidence under the doctrine of chances and the Utah Rules of Evidence. In addition, both he and the State urge us to overrule our doctrine-of-chances precedent.

¶47 Mr. Green also challenges the district court's admission of several out-of-court statements, claiming they are inadmissible hearsay. The State responds that the challenged statements were admissible because they fall under one or more exceptions to or exemptions from the hearsay rule.

¶48 Next, Mr. Green asserts that his counsel was ineffective in (1) moving to consolidate the six cases into one, (2) agreeing to the Tribune Stipulation and permitting documentary exhibits to go into the jury deliberations, (3) failing to object to hearsay statements, and (4) failing to challenge the purported improper racial theme allegedly developed by the State. Finally, Mr. Green asks us to reverse the jury verdict under the cumulative error doctrine.

¶49 We are persuaded that the doctrine of chances has, in significant respects, been difficult to apply in practice, and that its requirements deviate from the plain text of the rules of evidence. Accordingly, we abandon the doctrine in favor of a plain-text analysis of the rules of evidence. Reviewing the district court's other-acts evidence determination under the language of the rules of evidence, absent the doctrine-of-chances framework, we conclude that the district court did not abuse its discretion in admitting the evidence.

¶50 Mr. Green's additional challenges fail. All but four of the out-of-court statements admitted by the district court were admissible under the prior consistent statement rule. Although the remaining four do not fall under any hearsay exemption or exception, the court's errors in admitting them were harmless given the overwhelming evidence against Mr. Green and the fact that the statements were cumulative of other properly admissible evidence. Accordingly, Mr. Green's ineffective assistance of counsel claims fail, as does his cumulative error argument.

## I. We Abandon the Doctrine of Chances in Favor of a Plain-Text Application of the Rules of Evidence

### A. The Doctrine of Chances Is an Analytical Framework for Assessing Some Other-Acts Evidence Under the Rules of Evidence

¶51 The doctrine of chances was born of a desire to provide an analytical framework for addressing tensions inherent in rule 404(b) of the Utah Rules of Evidence. That rule forbids "[e]vidence of a crime, wrong, or other act" when offered "to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character."[10] But it permits this type of evidence when offered for "another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."[11] The tension created by these provisions is exacerbated by the fact that "evidence of prior bad acts often will yield dual inferences—and thus betray both a permissible purpose and an improper one."[12]

¶52 The doctrine of chances is intended to serve as an analytical tool for assessing "other-acts" evidence in some contexts. Traditionally, the doctrine has been used to rebut a defendant's claim that an unlikely event resulted from mistake, coincidence, or accident. In one famous example, referenced in *State v. Verde*,[13] a defendant, Smith, was charged with murder after his putative wife, Mundy, died in the bathtub.[14] In his defense, Smith claimed that Mundy's death was accidental.[15] To rebut that defense, the prosecution presented evidence showing that two other women who had purportedly been married to Smith had also died in their bathtubs under similar circumstances.[16] On appeal, the court determined that although the evidence of the two other deaths was inadmissible as evidence of Smith's bad character, it was

---

[10] UTAH R. EVID. 404(b)(1).

[11] *Id.* R. 404(b)(2).

[12] *State v. Verde*, 2012 UT 60, ¶ 16, 296 P.3d 673, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016.

[13] *See id.* ¶ 49 & n.20.

[14] *See R v. Smith*, (1915) 11 Crim. App. 229 (KB).

[15] *See id.* at 233.

[16] *See id.* at 229.

nevertheless admissible because it bore "upon the question whether the acts alleged to constitute the crime . . . were designed or accidental."[17]

¶53 Under our formulation of the doctrine of chances, we have allowed other-acts evidence to be admitted to show "the objective improbability of the same rare misfortune befalling one individual over and over."[18] Of particular relevance to Mr. Green's case, our doctrine-of-chances caselaw has allowed for the admission of other-acts evidence to rebut a defendant's claim of fabrication.[19]

¶54 In cases implicating the doctrine of chances, we have required that a party seeking to admit other-acts evidence "satisfy four threshold showings: materiality, similarity, independence, and frequency,"[20] which aim to assess "whether a body of prior bad acts evidence is being employed for a proper, non-character statistical inference."[21] If these foundational requirements are met, the doctrine then asks a district court to evaluate the evidence under rule 403.[22] At this stage, we have required that courts "identify the likely inferences the jury would draw from the other-acts evidence and then ask if the evidence's probative value (the jury drawing a permissible inference) [is] substantially outweighed by the danger of unfair prejudice (the jury drawing an impermissible inference)."[23]

*B. More Good Than Harm Will Come from Abandoning the Doctrine of Chances*

¶55 Both Mr. Green and the State ask us to overturn our doctrine-of-chances precedent. Mr. Green asks us to "overturn [our] holdings in *State v. Verde* . . . about the admissibility of evidence under the

---

[17] *Id.* at 237.

[18] *Verde*, 2012 UT 60, ¶ 47 (cleaned up).

[19] *See id.* (explaining that the "doctrine defines circumstances where prior bad acts can properly be used to rebut a charge of fabrication").

[20] *State v. Richins*, 2021 UT 50, ¶ 56, 496 P.3d 158.

[21] *State v. Lowther*, 2017 UT 34, ¶ 21, 398 P.3d 1032.

[22] *See Verde*, 2012 UT 60, ¶ 57 (stating that the "four foundational requirements . . . should be considered within the context of a rule 403 balancing analysis").

[23] *Richins*, 2021 UT 50, ¶ 103.

doctrine of chances." The State contends that our "recent, judicially created 'doctrine of chances'" is not "valid."

¶56 "[W]e do not overrule our precedents lightly,"[24] and we avoid doing so "unless they've proven to be unpersuasive and unworkable, create more harm than good, and haven't created reliance interests."[25] We are persuaded that, with respect to the doctrine of chances, the "intentionally high bar"[26] for overruling precedent has been cleared.

¶57 Significantly, the parties agree. Though their arguments proceed under different rationales, Mr. Green and the State agree that the doctrine is based on unpersuasive authority and has been difficult to apply in practice. They also seem to agree—again, albeit for different reasons—that the doctrine has created more harm than good. And the parties agree that because the doctrine was introduced into our caselaw just over a decade ago and has changed in its application since then, the doctrine has not created reliance interests.

¶58 We have recognized that "a uniform view amongst the parties is a unique and powerful tell: damning evidence of how poorly the test has worked and of the negligible benefit, if any, it's generated."[27] Here, we afford weight to the fact that both Mr. Green and the State criticize the doctrine of chances and urge us to reconsider its place in our caselaw.

¶59 Moreover, we note that in previous doctrine-of-chances cases, we have acknowledged that criticisms like those described in the parties' briefs "merit careful consideration."[28] And, on occasion, in an effort to refine the doctrine and clarify its application, we have done our best to address some of these criticisms.[29] Yet, despite our

---

[24] *Eldridge v. Johndrow*, 2015 UT 21, ¶ 21, 345 P.3d 553 (cleaned up).

[25] *Neese v. Utah Bd. of Pardons & Parole*, 2017 UT 89, ¶ 57, 416 P.3d 663.

[26] *State v. Wilder*, 2018 UT 17, ¶ 19, 420 P.3d 1064.

[27] *Id.* ¶ 27.

[28] *See State v. Argueta*, 2020 UT 41, ¶ 33, 469 P.3d 938.

[29] *See id.* ¶ 30 (taking the "opportunity to further clarify the application of the doctrine of chances and the burden that the party

(continued . . .)

efforts to clarify the doctrine, we seem to have generated more confusion than light. This leads us to conclude that while the doctrine may have been analytically helpful in some cases, it has been confusing and difficult to apply in others. And because we are not convinced that further attempts at elucidating the doctrine will yield greater clarity, we conclude that more good than harm will come from abandoning the doctrine.

### C. The Rules of Evidence Constitute the Primary Law of Evidence

¶60 While the State articulates a clear path forward absent the doctrine of chances—suggesting that the concerns the doctrine seeks to address are "more elegantly resolved" in the plain language of the rules of evidence—Mr. Green has not done so. He argues that the doctrine lacks adequate safeguards and should not be available to rebut a defendant's fabrication defense, but he does not explain how to implement additional safeguards absent the framework the doctrine provides. Regardless, we are convinced that the correct approach to admitting other-acts evidence is to adhere to the text of the rules of evidence.

¶61 On several occasions we have affirmed that courts are bound by the text of the rules of evidence.[30] In *State v. Thornton*, for example, we repudiated the requirement in our prior opinions that trial judges scrupulously examine other-acts evidence under rule 404(b).[31] Upon reflection, we concluded that the "scrupulous examination" requirement was "more confusing than helpful."[32] In eliminating that requirement, we stressed "that 'scrupulous examination' is not an independent requirement of rule 404(b)"[33] and "that it is *our rules* that state the primary law of evidence in the State of Utah."[34]

---

seeking to admit evidence under the doctrine must meet"); *Richins*, 2021 UT 50, ¶ 53 (responding to appellant's "valid concerns about the application of the doctrine of chances").

[30] *See, e.g., Lowther*, 2017 UT 34, ¶ 1 ("In applying rule 403, a court is not required to consider any set of factors or elements, but is bound by the language of the rule.").

[31] 2017 UT 9, ¶ 44.

[32] *Id.* ¶¶ 3, 44, 47.

[33] *Id.* ¶ 55.

[34] *Id.* ¶ 46 (cleaned up).

¶62 The doctrine of chances has likewise proven to be more confusing than helpful. And its requirements have strayed from the plain text of the rules of evidence. So we now overrule the doctrine of chances and reemphasize that the rules of evidence represent the primary law of evidence.

¶63 "Evidence of prior bad acts must clear several evidentiary hurdles before admission—rules 404(b), 402, and 403."[35] Under rule 404(b), the question "is whether the evidence has a plausible, avowed purpose beyond the *propensity* purpose that the rule deems improper. If it does then the evidence is presumptively admissible (subject to rule 402 and 403 analysis)."[36] Rule 402 "requires that evidence be relevant, which is defined in rule 401 as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[37] And rule 403 permits a trial court to exclude evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[38]

¶64 In sum, the rules of evidence provide that evidence of prior crimes, uncharged misconduct, or bad acts "is admissible if it (1) is relevant to, (2) a proper, non-character purpose, and (3) does not pose a danger for unfair prejudice that substantially outweighs its probative value."[39]

## II. The District Court Did Not Abuse Its Discretion in Admitting the Other-Acts Evidence

¶65 Having abandoned the doctrine of chances, we must determine whether the district court's admission of the other-acts evidence in Mr. Green's case was supportable under a plain reading

---

[35] *State v. Lucero*, 2014 UT 15, ¶ 13, 328 P.3d 841, *abrogated on other grounds by Thornton*, 2017 UT 9.

[36] *Thornton*, 2017 UT 9, ¶ 58.

[37] *Lucero*, 2014 UT 15, ¶ 17 (cleaned up).

[38] UTAH R. EVID. 403.

[39] *State v. Killpack*, 2008 UT 49, ¶ 45, 191 P.3d 17 (cleaned up).

of the rules of evidence.[40] Though the district court viewed its analysis of the other-acts evidence's admissibility through the doctrine-of-chances lens, we determine that its ultimate conclusion was not error under a textual analysis of the rules of evidence.[41] The evidence is admissible under a plain reading of rule 404(b), and the district court did not abuse its discretion in concluding that the evidence did not violate rule 403.[42]

---

[40] We note the possible alternative approach of reviewing the district court's other-acts evidence determination under the doctrine of chances and abandoning the doctrine prospectively only. Under the "long-standing traditional rule,"

> the law established by a court decision applies both prospectively and retrospectively, even when the decision overrules prior case law. Only if retrospective application of a decision creates a substantial injustice will a court limit a new decision to prospective application. A substantial injustice is often shown by an impairment of legal interests or expectations that have been created by reliance on the old law.

*State v. Saunders*, 1999 UT 59, ¶ 53, 992 P.2d 951 (plurality opinion) (cleaned up). We adhere to the traditional approach here and accordingly apply the law established by this decision both prospectively and retrospectively. Mr. Green has asked that we overrule our doctrine-of-chances precedent. In doing so, he acknowledges that "there is not a strong reliance interest that would be compromised." So we conclude that Mr. Green's legal interests and expectations are not impaired by our application of the plain text of the rules of evidence to the facts of his case.

[41] *See State v. Thornton*, 2017 UT 9, ¶ 51, 391 P.3d 1016 ("For most decisions reviewed on appeal, the error, if any, is in making an incorrect decision on the operative question presented."); *see also State v. Von Niederhausern*, 2018 UT App 149, ¶ 14, 427 P.3d 1277 ("[W]e no longer focus on the path the trial court followed in reaching its conclusion, but review only the conclusion itself.").

[42] Mr. Green does not dispute the relevance of the other-acts evidence under rule 402.

### A. The Other-Acts Evidence Is Admissible Under a Plain Reading of Rule 404(b)

¶66 Mr. Green contends that the other-acts evidence is inadmissible under the plain language of rule 404(b) because in his case there is no "genuine issue of mistake or accident."[43] The State, on the other hand, asserts that the evidence is admissible under the plain language of rule 404(b) because it is relevant to a proper, non-character purpose—the purpose of rebutting Mr. Green's claims of fabrication.

¶67 The State asked the district court to admit the other-acts evidence, arguing it is admissible to rebut Mr. Green's "charge of fabrication, mistake, or lack of intent." In its view, the evidence is "highly probative of the primary issue at trial—whether the complaining witness is fabricating her allegation of sexual assault and/or whether Mr. Green mistakenly believed the complaining witness consented to sexual activity." The district court admitted the evidence. It reasoned that the State had "offered the evidence for the purpose of rebutting arguments against fabrication, consent, or lack of intent, rather than as evidence of [Mr. Green's] propensity to commit crime."

¶68 The plain language of rule 404(b) prohibits the admission of evidence of a "crime, wrong, or other act" when offered "to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character."[44] The rule goes on to say that this type of evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."[45]

---

[43] Mr. Green requests that if we overturn or limit our doctrine-of-chances holdings, we remand for the district court to determine "in the first instance" whether the other-acts evidence is admissible under rule 404(b). This request rests on a misunderstanding of the doctrine of chances. As noted above, the doctrine is meant to guide the analysis under rules 404(b) and 403. It therefore does not supplant analysis under rule 404(b); rather, it aids that analysis. Here, the district court did not, as Mr. Green suggests, fail to consider the other-acts evidence under rule 404(b).

[44] UTAH R. EVID. 404(b)(1).

[45] *Id.* R. 404(b)(2).

The question before us, then, is whether the State offered the other-acts evidence to prove Mr. Green's character in order to show that he acted in conformity with his character, or whether the State offered it "for another purpose."

¶69 Mr. Green's primary defense at trial was that the victims fabricated their accusations for various reasons, including because they sought "money" and "attention" and because they were "upset about not getting another date." The district court admitted evidence of other acts to "dispel any realistic possibility of independent invention." In other words, the evidence was admitted to rebut Mr. Green's fabrication defense.

¶70 The list of enumerated purposes for which other-acts evidence may be admissible under rule 404(b) does not include the rebuttal of fabrication. But the plain text of the rule, in conjunction with the other rules of evidence, suggests that the evidence may be admissible to rebut a fabrication defense. We have described rule 404(b) as an "inclusionary rule with regard to other . . . evidence [of crimes] which is offered for a proper, noncharacter purpose."[46] In a footnote in *State v. Lowther*, we mentioned that there is no "presumption of either admissibility or inadmissibility" within rule 404(b).[47] But while there is no express presumption of admissibility or inadmissibility, a contextual analysis of the rules and their structure supports an inclusionary approach to admitting evidence under rule 404(b). Rule 402 provides that relevant evidence is generally admissible unless prohibited by the United States or Utah Constitutions, statute, or applicable rule.[48] Rule 401 defines evidence as "relevant" if it "has any tendency to make a fact more or less probable" and "is of consequence."[49] And rule 404(b)'s use of "such as" indicates that the list of non-character purposes is "illustrative and not exclusive."[50]

---

[46] *See State v. Decorso*, 1999 UT 57, ¶ 24, 993 P.2d 837, *abrogated on other grounds by Thornton*, 2017 UT 9.

[47] 2017 UT 34, ¶ 30 n.40, 398 P.3d 1032.

[48] UTAH R. EVID. 402.

[49] *See id.* R. 401.

[50] *See State v. Verde*, 2012 UT 60, ¶ 15, 296 P.3d 673, *abrogated on other grounds by Thornton*, 2017 UT 9.

¶71 Stated plainly, whether other-acts evidence is admissible under rule 404(b) depends only on whether it is being offered for a non-character purpose. Although, as Mr. Green accurately points out, the other-acts evidence in his case was not admitted to show the absence of mistake or accident, it was admitted for a non-character purpose—to show that the women's allegations were not recently fabricated. Mr. Green put the women's credibility at issue by claiming they were lying, and the accusations of multiple similar acts of sexual misconduct by Mr. Green corroborated each woman's story. The other-acts evidence was therefore admissible under a plain-text reading of rule 404(b).

### B. The District Court Did Not Abuse Its Discretion in Admitting the Other-Acts Evidence Under Rule 403

¶72 Mr. Green next challenges the district court's determination that the other-acts evidence is admissible under rule 403. He offers three ways in which the district court's admission of the evidence violated the rule: (1) the court failed to weigh competing inferences, (2) the court failed to consider the prejudicial effect of the number of other accusers and the volume of the other-acts evidence, and (3) the court's limiting instruction did not mitigate the unfair prejudice created by the other-acts evidence. We are not convinced by Mr. Green's arguments and conclude that the district court's decision to admit the other-acts evidence was within its discretion.

¶73 Mr. Green argued to the district court that the other-acts evidence was inadmissible under rule 403 because, in his view, there was no "need for the evidence," the "duplicative evidence" created a risk of provoking a sense of horror in the jury, and the State's purpose in admitting the evidence was simply to bolster the victims' credibility. While the court recognized the "danger of unfair prejudice," it identified two reasons that danger did not make the evidence inadmissible under rule 403. First, it determined that the danger of unfair prejudice was mitigated because the other-acts evidence was "highly similar" in each case. Second, it concluded that it could further mitigate the danger of unfair prejudice by presenting a limiting instruction to the jury.

¶74 Mr. Green first challenges the court's decision by claiming the court failed to weigh competing inferences. He defends this position by pointing to our holding in *State v. Richins*.[51] In that case,

---

[51] 2021 UT 50, 496 P.3d 158.

Richins was charged with lewdness when a fifteen-year-old girl alleged she saw him masturbating in his yard.[52] The district court admitted evidence of "four prior occasions when Richins had been accused of exposing and/or stimulating himself in public," and the court of appeals upheld that determination.[53] After reviewing the case under the doctrine-of-chances framework, we reversed.[54] We held that the court of appeals incorrectly analyzed the doctrine's frequency requirement and that the other-acts evidence ran afoul of rule 403.[55] We explained we had "always envisioned that rule 403 would play a crucial role in the doctrine of chances analysis."[56] And we discussed the requirement, which originated in *State v. Verde* and continued to develop thereafter, that if other-acts evidence "may sustain both proper and improper inferences under rule 404(b), the court should balance the two against each other under rule 403."[57] In Richins's case, we concluded that because the district court had not conducted the balancing described in *Verde* and subsequent caselaw (i.e., the court had not balanced competing (proper and improper) inferences), the court of appeals erred in upholding the district court's other-acts evidence determination under rule 403.[58]

¶75 Although Mr. Green accurately describes our analysis and holding in *Richins*, we note that our review in that case was conducted under the doctrine-of-chances framework. As noted above, having abandoned that framework, we now review Mr. Green's case to determine whether the district court abused its discretion under the plain text of the rules of evidence, without consideration of the doctrine of chances. Our holding in *Richins* is therefore less relevant than it would be if we were to retain the doctrine.

¶76 In reviewing the other-acts evidence under rule 403, the district court in Mr. Green's case recognized the State's avowed purpose in seeking to admit the evidence—"to rebut arguments that

---

[52] *Id.* ¶¶ 1, 4.

[53] *Id.* ¶¶ 2–3, 32–35.

[54] *Id.* ¶¶ 41–55, 114–15.

[55] *Id.* ¶¶ 96, 103–04.

[56] *Id.* ¶ 98.

[57] *Id.*; *Verde*, 2012 UT 60, ¶ 18.

[58] *Richins*, 2021 UT 50, ¶ 103.

the alleged victims' testimony was fabricated, that the sexual conduct was consensual, or that [Mr. Green] believed he had received consent and thus lacked the requisite mens rea." Acknowledging the possibility that the evidence could create "an undue tendency to suggest decision on an improper basis," the court described the possibility that the evidence could "lead a jury to punish [Mr. Green] for acts other than those charged in the instant case, or confuse it." Weighing the probative value of the evidence against the dangers set forth in rule 403, the court determined that "the danger of unfair prejudice is slight . . . and does not outweigh the highly probative value of [the] evidence."

¶77 Among other reasons for admitting the evidence, the court referred to its analysis of the similarity requirement under the doctrine of chances to explain the evidence's probative value. In that analysis, the court highlighted the similarities among the women's accounts. As one example, in C.H.'s case, the court noted as follows:

> According to her testimony, like three of the other alleged victims, she met [Mr. Green] on Tinder. Like five of the others, she was assaulted at her first private meeting with [Mr. Green]. Like five of the others, her assault occurred at [Mr. Green's] apartment. Like four of the others, he had put on a movie for them to watch first. Like all the others, she verbally and physically communicated that she did not consent. Like five of the others, it was a vaginal rape with his penis. Like four of the others, he told her she would enjoy it or was enjoying it.

Mr. Green contends that the similarity of the allegations did not reduce the likelihood that the jury would draw an improper probability inference from the evidence. Indeed, the district court considered the possibility that the jury would use the other-acts evidence to draw an improper inference, but, given the similarities among the women's accounts, it concluded that it was unlikely that a jury would find the evidence in one woman's case to be lacking but find the evidence in another woman's case compelling enough to deliver a verdict on an improper basis.

¶78 Under the language of rule 403, "the probative value of the evidence must be *substantially* outweighed by the danger of *unfair* prejudice; and unfair prejudice results only where the evidence has

an undue tendency to suggest decision upon an improper basis."[59] We therefore "indulge a presumption in favor of admissibility."[60] With these principles in mind, we acknowledge that the other-acts evidence prejudiced Mr. Green. But we cannot say that the district court abused its broad discretion in concluding that the similarities among the women's accounts reduced the tendency for the jury to decide upon an improper basis and that the danger of unfair prejudice did not substantially outweigh the evidence's probative value.

¶79 Mr. Green also disputes the district court's other-acts determination under rule 403 because, he contends, the court failed to consider the prejudicial effect of the number of other accusers and the volume of other-acts evidence. We decline to overturn the district court's determination on this ground, because we conclude that the court did not overlook the considerations Mr. Green raises. The district court considered Mr. Green's argument that if the jury were "allowed to hear a parade of six women all testify as to alleged assaults, . . . the duplicative evidence has a serious risk of arousing a sense of horror in the jury." It noted the possibility that "[a] jury, listening to a litany of accusations, could be tempted to deliver a verdict on a basis other than the evidence in the instant case" but nevertheless determined that the danger of unfair prejudice did not substantially outweigh the evidence's probative value.

¶80 The district court reasoned that a limiting instruction would serve to offset the danger of unfair prejudice posed by the other-acts evidence. The limiting instruction to the jury stated, in relevant part:

> Evidence that defendant committed alleged crimes against the other alleged victims was not admitted to show that he has a general criminal propensity, or to prove a character trait of the defendant, or to show that he acted in a manner consistent with such a trait. You may not convict a person of a crime simply because you believe he may have committed some other act at another time.

Mr. Green contends, pointing again to *Richins* for support, that the court's limiting instruction was insufficient to have a curative effect

---

[59] *State v. Lucero*, 2014 UT 15, ¶ 32, 328 P.3d 841 (cleaned up), *abrogated on other grounds by Thornton*, 2017 UT 9.

[60] *Id.* (cleaned up).

and thereby render the other-acts evidence admissible under rule 403. In *Richins* we "applaud[ed]" and "commend[ed] the district court for its decision to . . . instruct the jury about the proper use of prior acts evidence" but ultimately held that "the danger of the jury drawing the impermissible inference so substantially outweighed the evidence's probative value that the . . . jury instruction could not have a curative effect."[61] We noted that "[i]n a different case," steps like issuing a jury instruction "might have had a material impact on the rule 403 balancing."[62] We think this happened in Mr. Green's case. The district court issued the limiting instruction to "ensure that the jury does not misunderstand the purpose of the . . . evidence and misapply it." It took this step while weighing the probative value of the evidence against the danger of unfair prejudice. And it ultimately determined that the danger of unfair prejudice was mitigated by the similarities among the accounts and by the limiting instruction. We hold that this determination was not an abuse of discretion under the plain language of rule 403.

¶81 In sum, the district court did not abuse its discretion in admitting the other-acts evidence. The evidence was admitted for a non-character purpose under rule 404(b), and the district court was within its discretion when it determined that the evidence's probative value was not substantially outweighed by a danger of unfair prejudice under rule 403.

### III. The District Court Did Not Abuse Its Discretion in Admitting Out-of-Court Statements

*A. All but Four of the Out-of-Court Statements Qualify as Being "Not Hearsay" Under the Prior Consistent Statement Exemption to the Hearsay Rule*

¶82 In vying for the admissibility of the out-of-court statements at issue here, the State primarily argues that the declarations were prior consistent statements offered to rebut a charge of recent fabrication. Mr. Green argues that the prior consistent statement exemption does not apply because the victims had motive to fabricate their accusations.

---

[61] *Richins*, 2021 UT 50, ¶ 106.

[62] *Id.*

¶83 Hearsay is generally defined as an out-of-court statement offered "to prove the truth of the matter asserted."[63] In other words, hearsay is a statement that the declarant originally made outside of the current trial or hearing and is now being used to prove the truth of what was said.[64] There are multiple exemptions from and exceptions to the rule against hearsay. Under specific circumstances, some out-of-court statements used for their truth are classified as "not hearsay" and are excluded from the rule.[65] Others are still considered hearsay but are nonetheless admissible due to the conditions under which they were made.[66] Where an exemption or exception does not apply, and counsel fails to object to a statement's admission, a defendant may, in some cases, bring a subsequent claim for ineffective assistance of counsel.[67]

¶84 Rule 801 provides a relevant exemption to the rule against hearsay, defining certain statements as "not hearsay" where the declarant (1) testifies, (2) is subject to cross-examination, (3) the statement is "consistent with the declarant's testimony," and (4) the testimony "is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying."[68] This is known as the prior consistent statement exemption to the hearsay rule. This exemption "applies only to premotive, consistent, out-of-court statements."[69] Its purpose "is to admit statements that rebut a charge of recent fabrication or improper influence or motive, not to bolster the believability of a statement already uttered at trial."[70] In other

---

[63] UTAH R. EVID. 801(c).

[64] *See, e.g., State v. Johnson*, 2022 UT 14, ¶ 21, 508 P.3d 100.

[65] *See* UTAH R. EVID. 801(d).

[66] *See id.* R. 803–804.

[67] *See, e.g., Bolander v. Iowa*, 978 F.2d 1079, 1084 (8th Cir. 1992) (holding that the defendant received ineffective assistance of counsel because his attorney did not object to hearsay statements made by the wife of the victim).

[68] UTAH R. EVID. 801(d)(1)(B).

[69] *State v. Bujan*, 2008 UT 47, ¶ 11, 190 P.3d 1255.

[70] *Id.*

words, "such statements are admissible only if they were made prior to the time a motive to fabricate arose."[71]

¶85 The State argues that almost all the out-of-court statements presented at trial qualify as prior consistent statements because any motive the victims may have had to fabricate arose at the time the Tribune Articles were published. The rationale behind the State's position is that this motive to coordinate fabrications (e.g., financial gain and attention)—a motive that Mr. Green advances—could not have existed before the initial allegations gained notoriety in the news. The State further emphasizes that rule 801 does not require that a prior statement rebut *all* possible improper influences or motives. Instead, it claims the rule merely requires that the prior statement "rebut *an* express or implied charge" of improper influence or motive.[72] In other words, the State argues that because the statements at issue were given independently and before the Tribune Articles were published—the publication constituting "an" improper motive for fabrication—the statements are admissible under rule 801.

¶86 In response, Mr. Green contends that the victims had motive to fabricate their statements even before the Tribune Articles were published; thus, the prior consistent statement exemption does not apply. He lists several potential motives the victims may have had to concoct their accusations (some of which theoretically arose immediately after the rapes occurred) that would render the statements inadmissible. And, to further his argument, Mr. Green asserts that for a prior consistent statement to be admissible under rule 801, it must have been given before *any* potential motive to fabricate arose.[73]

¶87 We disagree with Mr. Green's interpretation of rule 801 and, for the reasons discussed below, hold that all but four of the out-of-court statements at issue qualify as prior consistent statements and that the district court did not abuse its discretion in admitting them.

---

[71] *State v. Nunes*, 2020 UT App 145, ¶ 25, 476 P.3d 172 (cleaned up).

[72] (Quoting UTAH R. EVID. 801(d)(1)(B) (emphasis added).)

[73] Mr. Green also contends that his counsel at trial was ineffective because many of the statements were admitted without objection, but as discussed in Part IV *infra*, the errors were harmless.

Further, we hold that any error the district court made by admitting the four hearsay statements was harmless because the evidence against Mr. Green was overwhelming.

1. The Primary Motive for Fabrication Advanced by Mr. Green Is That the Victims Were Influenced by the Tribune Articles to Seek Notoriety or Financial Gain

¶88 It is undisputed that Mr. Green challenges the trustworthiness of his accusers. The bedrock of his defense is that the accusations against him were fabricated. While Mr. Green postulates various hypothetical motives for fabrication, all but one of these motives are referenced only in the footnotes of his briefs. In these footnotes, Mr. Green theorizes that the women might have lied about being sexually assaulted because they were upset about not getting a second date, or because they wanted to preserve a romantic relationship, avoid embarrassment, evade punishment for breaking curfew, fulfill an assignment for class, or receive academic accommodations. But Mr. Green provides little support for these theories, and from the body of his briefs, it is clear that the main theory Mr. Green advances in support of his claim that the women fabricated their allegations is that they had been influenced by the Tribune Articles.

¶89 While Mr. Green does not clearly articulate what about the Tribune Articles motivated the women to accuse him, he references their publication and the effect they had on the women more than two dozen times throughout his briefs. For example, Mr. Green repeatedly emphasizes that five of the six victims did not report being raped to the police until after at least one of the Tribune Articles had been published. Also, multiple times, Mr. Green asserts that the similarities and details from the women's allegations stem from their having read the Tribune Articles. And, on more than one occasion, Mr. Green specifically claims that the Tribune Articles provided the victims with both the motive and the ability to fabricate.

¶90 These repeated references strongly suggest that Mr. Green contends that all six women were primarily motivated by the desire for attention or the prospect of financial gain. This inference is further supported by the record before us, which indicates that on at least four occasions, Mr. Green asserted that the women waited to accuse him until he had "signed a contract to play professional football," insinuating that the women's true motive—bolstered by the publication of the Tribune Articles—was (as articulated by Mr. Green) that they wanted "money" or "attention." So both the record

and the parties' briefs demonstrate that the primary motive asserted by Mr. Green for fabrication arose on July 21, 2016, when the first Tribune Article was published. Because most of the statements that Mr. Green challenges were made long before that date and were offered to rebut his express charge of fabrication, they are admissible under rule 801.[74]

a. All but two of the statements at issue in M.H.'s case are prior consistent statements

¶91 All but two of the statements at issue in M.H.'s case are admissible under rule 801. A.W.'s testimony, A.W.'s Cousin's testimony, and M.H.'s poem were all properly admitted—A.W.'s testimony and A.W.'s Cousin's testimony both recount statements given before the motive to fabricate created by the Tribune Articles arose, and M.H. wrote her poem almost three years before the first Tribune Article was published. A.W. testified that in November or December 2013, M.H. told him she had been raped. A.W.'s Cousin testified that in November or December 2013, A.W. told him that he had heard that M.H. had been raped. And M.H.'s poem, which details her rape, was written in November 2013. In other words, all three of these statements were given almost three years before the first Tribune Article was published in July 2016. Because these statements were offered to rebut Mr. Green's claim that M.H. recently fabricated her accusations, they are admissible under rule 801, and the district court did not abuse its discretion in admitting them.

¶92 Only the statements proffered by A.H. and N.M.—that in the summer of 2016, M.H. told them Mr. Green had raped her—were given after the publication of the first Tribune Article. The district court, therefore, erred in admitting them.

b. All the statements at issue in L.P.'s case are prior consistent statements

¶93 The statements Mr. Green challenges in L.P.'s case are admissible under rule 801. The testimonies of K.E., M.J., and S.S.— that in October 2014, L.P. told them that Mr. Green had physically restrained her and tried to rape her—are statements given almost

---

[74] For the purposes of our analysis concerning the victims' recent motive to fabricate, we assume that the Tribune Articles qualify as a sufficient motive under rule 801.

two years before the first Tribune Article was published in July 2016. And K.P.'s testimony—that in October 2014, L.P. told her that while on a date with Mr. Green, she was "raped with her clothes on"—is a statement that was also given almost two years before the first Tribune Article was published. So because these statements were offered to rebut Mr. Green's claim that L.P. fabricated her accusations, they are admissible as prior consistent statements, and the district court did not abuse its discretion in admitting them.

c. Only one of the statements at issue in C.H.'s case fails to qualify as a prior consistent statement

¶94 In support of C.H.'s allegations, the State called C.H.'s sorority sister, A.N., who testified that in October 2015, C.H. told her that she had been raped. A.N. further testified that sometime in 2016, after the first two Tribune Articles were published, C.H. told her that Mr. Green was the one who raped her. The first of these two statements was given almost a year before any Tribune Article was published and was offered to rebut Mr. Green's claim that C.H. fabricated her accusations; thus, the district court did not abuse its discretion in admitting it. But the second statement, which identified Mr. Green as the person who raped her, was given shortly after two of the Tribune Articles were published, so the court erred in admitting it at trial.

d. All but one of the statements at issue in C.D.'s case are prior consistent statements

¶95 Only one of the statements at issue in C.D.'s case was given after the publication of the first Tribune Article; all the others qualify as prior consistent statements. C.D.'s Friend's testimony—that in the fall of 2014, C.D. told him that Mr. Green forced himself on her—was given almost two years before the first Tribune Article was published. The essay that C.D. wrote, which described her experience as a rape victim, was written in October 2014, also pre-dating the Tribune Articles by almost two years. And the testimony that her mother, A.D., gave—that in the fall of 2015, C.D. told her that she had been raped—was likewise given almost a year before the first Tribune Article was published. So because they were offered to rebut Mr. Green's claim that C.D. fabricated her accusations after reading the Tribune Articles, all these statements are admissible under rule 801, and the district court did not abuse its discretion in admitting them.

¶96 But the statement in A.D.'s testimony—that in 2016, C.D. told her that Mr. Green raped her—was given shortly after the first two

Tribune Articles were published, so the court erred in admitting it at trial.

e. All the statements at issue in A.P.'s case are prior consistent statements

¶97 All the statements Mr. Green challenges in A.P.'s case are admissible under rule 801. A.P.'s statement that B.H. mentioned in his testimony—that in July 2015, she told him that Mr. Green had raped her—was given a year before the first Tribune Article was published. And A.P.'s statement that J.E. quoted in her testimony—that in November 2015, A.P. told her that Mr. Green raped her—was made eight months before any of the Tribune Articles were published. So because they were offered to rebut Mr. Green's claim that A.P. fabricated her accusations, these statements qualify as prior consistent statements, and the district court did not abuse its discretion in admitting them.

f. All the statements at issue in V.S.'s case are prior consistent statements

¶98 All the statements Mr. Green challenges in V.S.'s case are admissible under rule 801. V.S.'s statement that both K.A. and R.B. repeated—that one night in January 2015, V.S. told them that Mr. Green raped her—was made a year and a half before the first Tribune Article was published. And V.S.'s statement that R.M. reiterated—that sometime in January 2015, V.S. told him that she had been raped—was also made 18 months before any Tribune Article was published. So because they were offered to rebut Mr. Green's claim that V.S. fabricated her accusations, these statements qualify as prior consistent statements, and the district court did not abuse its discretion in admitting them.

2. Rule 801(d)(1)(B) Does Not Require That Every Possible Motive to Fabricate Be Rebutted

¶99 Mr. Green expressly argues that the victims invented their stories of rape after reading the Tribune Articles. To rebut these claims, the State introduced the consistent testimony detailed above to support the victims' allegations. Rule 801(d)(1)(B) states that to be considered "not hearsay," the prior consistent statement must be offered "to rebut *an* express or implied charge" that the declarant fabricated the testimony provided.[75] The rule does not require that

---

[75] UTAH R. EVID. 801(d)(1)(B) (emphasis added).

the statement rebut *every* possible motive to fabricate. While Utah courts have yet to expound on this subject, other jurisdictions have analyzed this issue when interpreting versions of rules similar to 801(d)(1)(B). And where our caselaw analyzing a rule of evidence is insufficient, we may look to other courts' interpretations for guidance.[76]

¶100 In interpreting rule 801(d)(1)(B)(i) of the Federal Rules of Evidence—which is functionally identical to Utah rule 801(d)(1)(B)— the Ninth Circuit in *United States v. Kootswatewa*[77] explained that the rule "does not require that a prior statement rebut all improper influences or motives suggested by defense counsel. It is sufficient if the prior statement tends to rebut one of them."[78] Similarly, in *Dowthitt v. State*,[79] where a Texas court of appeals interpreted a rule of evidence that is also essentially identical to the Utah rule,[80] the court held, "[I]t is not necessary that a prior consistent statement have been made before *all* motives to fabricate arose. The rule requires merely that the witness' prior consistent statement be offered to rebut *an* express or implied charge against him of recent fabrication or improper influence or motive."[81] We agree with these courts. In Mr. Green's case, because the prior consistent statements were used to rebut Mr. Green's express claims of fabrication and were given before the first Tribune Article was published on July 21, 2016, we conclude that all but four of the statements were "not hearsay" under the prior consistent statement exemption to the hearsay rule. Thus, the district court did not err in admitting them at

---

[76] *See Robinson v. Taylor*, 2015 UT 69, ¶ 10, 356 P.3d 1230 (stating that when interpreting an evidentiary rule, we may "rely on interpretations of similar federal rules by federal courts to assist our own interpretation"); *State v. Vallejo*, 2019 UT 38, ¶ 76 n.14, 449 P.3d 39 ("[W]here a state court has interpreted a rule of evidence determined to be in lockstep with the respective federal rule, we may consider such state cases as well.").

[77] 893 F.3d 1127 (9th Cir. 2018).

[78] *Id.* at 1135.

[79] 931 S.W.2d 244 (Tex. Crim. App. 1996).

[80] *Compare* UTAH R. EVID. 801(d)(1)(B) *with* TEX. R. EVID. 801(e)(1)(B).

[81] *Dowthitt*, 931 S.W.2d at 264 (cleaned up).

trial. But because the four remaining out-of-court statements do not fall under a hearsay exception or exemption, the court erred in admitting them.

*B. The Court's Errors in Admitting the Four Hearsay Statements Were Harmless*

¶101 "[A]n erroneous decision to admit or exclude evidence . . . cannot result in reversible error unless the error is harmful."[82] So when an error is harmless, we do not disturb the district court's decision. "Harmless errors are errors which, although properly preserved below and presented on appeal, are sufficiently inconsequential that we conclude there is no reasonable likelihood that the error affected the outcome of the proceedings."[83] "For an error to require reversal, the likelihood of a different outcome must be sufficiently high to undermine confidence in the verdict."[84] When determining whether an error is harmless, "we consider a host of factors including, among others, the importance of the witness's testimony to the prosecution's case and the overall strength of the State's case. The more evidence supporting the verdict, the less likely there was harmful error."[85]

¶102 In the case before us, the evidence against Mr. Green is extensive. In light of everything presented at trial, including the testimony of the six victims; the statements given by their friends, family members, and colleagues; the documentary exhibits provided; and Mr. Green's own declarations, we conclude that the case against Mr. Green is overwhelming. Accordingly, the likelihood of a different outcome is insufficient "to undermine [our] confidence in the verdict,"[86] and we conclude that the errors the district court made in admitting the four statements were harmless.

---

[82] *State v. Hamilton*, 827 P.2d 232, 240 (Utah 1992).

[83] *Id.* (cleaned up).

[84] *State v. Knight*, 734 P.2d 913, 920 (Utah 1987).

[85] *Hamilton*, 827 P.2d at 240 (cleaned up); *see also State v. Fahina*, 2017 UT App 111, ¶ 29, 400 P.3d 1177 ("When determining whether an alleged error was harmful, we consider such factors as the importance of the relevant testimony, whether the testimony was cumulative, and the overall strength of the prosecution's case.").

[86] *Knight*, 734 P.2d at 920.

## IV. Mr. Green Has Not Shown That His Trial Counsel Was Ineffective

¶103 On appeal, Mr. Green argues that his counsel was ineffective at trial in several ways: first, for consolidating the six cases into one; second, for entering the Tribune Stipulation and permitting it and the documentary exhibits (M.H.'s poem and C.D.'s essay) to go into jury deliberations; third, for not objecting to the hearsay statements that were admitted at trial; and fourth, for not objecting to the State's "improper invocation of race" throughout the trial.[87] For the reasons discussed below, we hold that Mr. Green has not shown that his trial counsel was constitutionally ineffective.

¶104 *Strickland v. Washington*[88] governs a claim for ineffective assistance of counsel. Under *Strickland*, the test for assessing whether an attorney's performance amounts to ineffective assistance of counsel has two parts: "(1) whether counsel's performance was deficient in that it fell below an objective standard of reasonableness; and (2) whether counsel's performance was prejudicial in that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[89] To

---

[87] Mr. Green filed a rule 23B motion concurrently with his opening brief on appeal. In that motion, he asks that we remand this case for an entry of findings of fact, which Mr. Green asserts is necessary for his claims of ineffective assistance of counsel. Mr. Green argues that his counsel was ineffective for not calling four additional character witnesses at trial and for not objecting to allegedly harmful racial references made throughout the trial. He includes with his motion an affidavit from a private investigator who interviewed the four witnesses who did not testify. Having reviewed Mr. Green's motion and the record before us, we determine that the motion does not establish facts that, if true, would have likely changed the outcome here. First, due to the nature of what the witnesses would have testified about (Mr. Green's character), it is unlikely their testimony would have been anything other than cumulative—adding nothing substantial to the case. Second, Mr. Green makes no new arguments in his motion about the allegedly harmful racial references; he merely reiterates what he argues on appeal. We therefore deny Mr. Green's rule 23B motion.

[88] 466 U.S. 668 (1984).

[89] *Menzies v. Galetka*, 2006 UT 81, ¶ 87, 150 P.3d 480 (cleaned up).

determine whether Mr. Green has met his substantial burden, we must "eliminate the distorting effects of hindsight and evaluate the conduct from counsel's perspective at the time."[90] And "[b]ecause failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [Mr. Green's] claims under either prong."[91]

¶105 The first prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[92] "But so long as a rational basis for counsel's performance can be articulated, we will assume counsel acted competently."[93] Further, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. In order to overcome this presumption, the litigant must demonstrate that the challenged actions cannot be considered sound strategy under the circumstances."[94] Thus, "[a]n ineffective assistance of counsel claim will fail if a conceivable legitimate tactic or strategy can be surmised from counsel's actions."[95]

¶106 The second prong requires that Mr. Green demonstrate that "any deficiencies in counsel's performance were prejudicial to the defense."[96] "To do so, he must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[97]

*A. Defense Counsel Was Not Ineffective in Moving to Consolidate the Cases*

¶107 Mr. Green argues that counsel was ineffective in moving to consolidate the six cases. He asserts that had each case been tried

---

[90] *See id.* ¶ 89 (cleaned up).

[91] *See Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182 (cleaned up).

[92] *Strickland*, 466 U.S. at 687.

[93] *State v. Mohamud*, 2017 UT 23, ¶ 14, 395 P.3d 133 (cleaned up).

[94] *Menzies*, 2006 UT 81, ¶ 89 (cleaned up).

[95] *State v. Moore*, 2012 UT App 227, ¶ 6, 285 P.3d 809 (cleaned up).

[96] *Mohamud*, 2017 UT 23, ¶ 14 (cleaned up).

[97] *Honie*, 2014 UT 19, ¶ 33 (cleaned up).

separately, he might have had a better chance of acquittal because he could have focused on establishing reasonable doubt for one victim at a time. But the "mere potential effect on the outcome is not enough. Rather, the defendant must show a substantial likelihood of a different result as a demonstrable reality and not merely as a speculative matter."[98] Ultimately, the right to effective assistance of counsel "guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."[99]

¶108 Here, defense counsel requested that the cases be consolidated, likely at the behest of Mr. Green.[100] And counsel may have had logical reasons for doing so.[101] As the State pointed out, counsel may have moved to consolidate in order to (1) attack each woman's credibility in more detail at trial; (2) protect Mr. Green from the strain, embarrassment, anxiety, and expense of multiple proceedings; (3) preserve the trust, confidence, and close working relationship that defense counsel had with Mr. Green; or (4) increase Mr. Green's chances of avoiding a prison sentence by seeking a complete acquittal of all his charges at once. We are persuaded by the State's rationale—some or all of these may have been legitimate reasons for consolidation, especially where the district court had already granted a pretrial motion that would allow all six women's allegations to be admitted at all six trials. Where "a rational basis for counsel's performance can be articulated, we will assume counsel acted competently."[102] As we have repeatedly stated, simply because "a lawyer's legitimate exercise of judgment in the choice of trial strategy or tactics . . . [does] not produce the anticipated result," does

---

[98] *State v. Nunes*, 2020 UT App 145, ¶ 21, 476 P.3d 172 (cleaned up).

[99] *See Yarborough v. Gentry*, 540 U.S. 1, 8 (2003); *see also Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000) ("The relevant question is not whether counsel's choices were strategic, but whether they were reasonable.").

[100] *See Strickland*, 466 U.S. at 691 ("Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.").

[101] *See, e.g., State v. Prion*, 2012 UT 15, ¶ 31, 274 P.3d 919 (noting the desire to avoid the "personal strain, public embarrassment, and expense" of multiple criminal trials (cleaned up)).

[102] *State v. King*, 2010 UT App 396, ¶ 31, 248 P.3d 984 (cleaned up).

not mean that counsel was ineffective.[103] So Mr. Green's assertion that he might have had a better chance of winning one case at a time is insufficient to demonstrate that counsel's consolidation was unreasonable under the circumstances.[104] Therefore, Mr. Green's argument fails under the first prong of the *Strickland* test.

### B. Defense Counsel Was Not Ineffective in Agreeing to the Tribune Stipulation or in Permitting the Documentary Exhibits to Go into Jury Deliberations

¶109 Mr. Green argues that counsel was ineffective in agreeing to the Tribune Stipulation and allowing it and the documentary exhibits to accompany the jury into its deliberations. He asserts that because the stipulation is hearsay, counsel should have objected to it under rule 802 of the Utah Rules of Evidence. He also contends that because the documentary exhibits "were effectively a transcript of the women's trial testimony," they should not have been allowed to accompany the jury into its deliberations.[105] But neither of these arguments is persuasive. Like defense counsel's decision to consolidate the cases, here, "a conceivable legitimate tactic or strategy can be surmised from counsel's actions"[106] in agreeing to the Tribune Stipulation. One of the prominent arguments in Mr. Green's defense was that the Tribune Articles influenced and even prompted the victims' allegations. So providing the jury with details of the Tribune Articles may have been part of a legitimate strategy defense counsel envisioned.

¶110 As to the documentary exhibits, neither M.H.'s poem, C.D.'s essay, nor the Tribune Stipulation were transcripts—they were not "deposition testimony," "testimony given under oath," or statements made "at a prior proceeding."[107] Instead, they were all "received as

---

[103] *State v. Buel*, 700 P.2d 701, 703 (Utah 1985) (cleaned up).

[104] *See, e.g., id.* ("Defendant has failed to establish that defense counsel's strategy in consolidating the two charges for trial was anything other than a 'legitimate exercise of judgment.'").

[105] *See Wyatt v. State*, 2021 UT 32, ¶ 19 n.17, 493 P.3d ("The transcripts of deposition testimony and of testimony given under oath at a prior proceeding are not received as exhibits and do not go back with the jury.").

[106] *Moore*, 2012 UT App 227, ¶ 6 (cleaned up).

[107] *Wyatt*, 2021 UT 32, ¶19 n.17.

exhibits."[108] And because "the jury may take with [it] . . . all exhibits which have been received as evidence,"[109] there was no reason for defense counsel to object to their accompanying the jury into its deliberations.

¶111 In other words, we are not convinced that allowing the Tribune Stipulation into evidence or permitting the documentary exhibits to go into jury deliberations[110] was objectively unreasonable. So we cannot say the court abused its discretion in allowing them to accompany the jury into its deliberations, and Mr. Green's arguments fail under the first prong of the *Strickland* test.

### C. Defense Counsel Was Not Ineffective in Failing to Object to the Four Hearsay Statements

¶112  Mr. Green argues that counsel was ineffective in failing to object to the hearsay testimony presented at trial. As discussed above, we have already concluded that the district court's errors in admitting the four inappropriate hearsay statements were harmless. As such, we need not reach the question of whether defense counsel acted deficiently for failing to object to their admission.[111] So Mr. Green's argument in this regard fails.

### D. Defense Counsel Was Not Ineffective in Failing to Object to the Alleged Improper Racial Theme

¶113 Mr. Green argues that counsel should have objected to the State's crafting of an impermissible racial theme at trial. He contends that the State "elicited impermissible testimony about race and painted a picture of the women and [Mr. Green] that invoked racial stereotypes." Mr. Green references three specific incidents to support this assertion. But, for the reasons discussed below, we are not persuaded by Mr. Green's reasoning.

---

[108] *Id.*

[109] UTAH R. CRIM. P. 17.

[110] *See Wyatt*, 2021 UT 32, ¶ 19 (stating that Utah law "expressly authorizes all exhibits to go back with the jury subject to the court's broad discretion").

[111] *See Ross v. State*, 2019 UT 48, ¶ 94 n.12, 448 P.3d 1203 ("Because we conclude that [Petitioner] was not prejudiced by his trial counsel's failure . . . , we do not address the issue of whether his trial counsel's performance was deficient." (cleaned up)).

¶114 First, M.H. testified that after Mr. Green raped her, he said, "he really likes black girls because they are sassy, and if you try to have sex with them, you can't." The record does not support Mr. Green's assertion that the State used this testimony to craft an improper racial theme. According to the record, Mr. Green—not M.H.—was the one who purportedly made the racial comment; M.H. merely repeated it. The record also suggests that the State elicited this and other statements through a series of questions aimed at portraying Mr. Green as a manipulator, where the focus of the inquiry was not on race but instead on M.H. having told Mr. Green repeatedly that she did not want to have sex with him. And the State never suggested that Mr. Green's race was a factor the jury should consider in its deliberations. So defense counsel was not ineffective in declining to object to this testimony.

¶115 Second, A.P. testified that due to the stress and trauma caused by the rape, she developed an auto-immune disorder, as well as persistent heart, stomach, kidney, and brain issues. She further testified that she is no longer able to live alone, avoids visiting USU, abstains from traveling to the Logan or Brigham City areas, and has a difficult time being "around black men at all" because when she does, she has a "full-on panic attack." Again, the record does not support Mr. Green's assertion that the State used this testimony to craft an improper racial theme. Instead, the record indicates that the State wanted the jury to know that A.P. had developed PTSD and had suffered physically, mentally, and emotionally because of the rape. So defense counsel was not ineffective in declining to object to these statements.

¶116 Third, at trial, the State used adjectives such as "young," "naïve," and "innocent" to describe the six women. And in its opening and closing arguments, the State described Mr. Green as a "big, old, fast linebacker" (once in opening argument), a "wolf in sheep's clothing" (once in opening argument and once in closing argument), and someone who took women "back to his lair" (twice in closing argument). But nothing in the record before us indicates that the first reference—that Mr. Green was "a big, old, fast linebacker"—had anything to do with Mr. Green's race. And the references Mr. Green describes as being "animalistic"—that Mr. Green was a "wolf in sheep's clothing" and had a "lair"—were limited in number and occurred almost exclusively in the State's closing argument. In other words, these stray references never

developed into any clear racial theme. So it was not unreasonable for defense counsel to choose not to object to them, particularly where doing so might not have been worthwhile in a tactical sense.[112] Therefore, the record before us indicates that defense counsel was not ineffective in declining to object to these comments. Accordingly, we decline to overturn the jury's verdict.

### V. Mr. Green Has Not Established Cumulative Error

¶117 Mr. Green contends that the cumulative error doctrine requires reversal due to the aggregated prejudicial effects of the errors alleged. Under that doctrine, a reviewing court will reverse a jury verdict

> only if the cumulative effect of the several errors undermines confidence that a fair trial was had. If, however, we determine that a defendant's claims do not constitute errors on the part of the trial court, then it follows that the requirements of the cumulative error doctrine are not met.[113]

Here, we have concluded that the district court's only errors—admitting the four hearsay statements—were harmless. Additionally, we have determined that counsel was not ineffective. Accordingly, there are not multiple errors to cumulate, and Mr. Green's cumulative error claim necessarily fails.[114]

### Conclusion

¶118 Because the doctrine of chances has proven to be difficult to understand and apply, we abandon it in favor of a plain-text application of the Utah Rules of Evidence. Under the rules of evidence, the district court in Mr. Green's case did not abuse its discretion in admitting the other-acts evidence.

---

[112] *See* Steven Lubet, *Objecting*, 16 AM. J. TRIAL ADVOC. 213, 219–20 (1992) ("[C]ounsel must evaluate the tactical situation in order to determine whether the objection is worth making.").

[113] *State v. Killpack*, 2008 UT 49, ¶ 56, 191 P.3d 17 (cleaned up).

[114] *See State v. Glasscock*, 2014 UT App 221, ¶ 34, 336 P.3d 46 ("Having found no error, [Petitioner's] cumulative error claim fails.").

¶119 Four of the out-of-court statements challenged by Mr. Green fall outside the hearsay exceptions and exemptions of our rules of evidence. But because the evidence was overwhelming, and the four inadmissible statements were merely cumulative, the district court did not abuse its discretion in admitting them. Mr. Green's ineffective assistance of counsel and cumulative error claims also fail.

¶120 We affirm Mr. Green's convictions.

———————