*This opinion is subject to revision before final publication in the Pacific Reporter*

**2025 UT 10**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellant,*

*v.*

KOURI DARDEN RICHINS,
*Appellant.*

No. 20241329
Heard February 11, 2025
Filed April 24, 2025

On Appeal of Interlocutory Orders

Third District Court, Summit County
The Honorable Richard E. Mrazik
The Honorable Laura S. Scott
No. 231500139

Attorneys*:

Derek E. Brown, Att'y Gen., Marian Decker, Asst. Solic. Gen.,
Salt Lake City, for appellant

Freyja Johnson, Emily Adams, Hannah Leavitt-Howell, Bountiful,
for appellant

ASSOCIATE CHIEF JUSTICE PEARCE authored the opinion of the
Court, in which CHIEF JUSTICE DURRANT, JUSTICE PETERSEN,
JUSTICE HAGEN, and JUSTICE POHLMAN joined.

---

\* Additional attorneys: Bryson King, Salt Lake City, for *amicus
curiae* Third District Court Presiding Judge Laura S. Scott.

ASSOCIATE CHIEF JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1    The State of Utah has charged Kouri Darden Richins with, among other things, aggravated murder. When we heard argument, Richins's trial was set to begin in April 2025 in Summit County.

¶2    The State and Richins (together, the Parties) jointly appeal two district court decisions. First, the Presiding Judge of the Third District Court, Laura Scott (Presiding Judge), denied the Parties' stipulated request to hold jury selection for Richins's trial in person. The Third District Court (Third District) has adopted a standing order that requires jury selection to occur virtually unless the Presiding Judge concludes that "extraordinary circumstances" exist to vary from the rule. The Presiding Judge concluded that the intense media attention surrounding the proceedings did not constitute extraordinary circumstances. Next, Judge Richard Mrazik (Trial Judge), who is, at the time this opinion is to publish, slated to preside over Richins's trial, denied the Parties' stipulated request to expand the jury venire to include prospective jurors from Summit and Salt Lake counties. The Trial Judge originally granted that request before reversing course.

¶3    The Parties contend that the Presiding Judge and the Trial Judge erred when they denied the pair of stipulated requests. The Parties argue that the Presiding Judge applied the wrong legal standard and that her decision was outside the bounds of her discretion. With respect to the request to pull jurors from two counties, the Parties argue that the Trial Judge misinterpreted Utah law to reach his conclusion.

¶4    On February 18, 2025, we issued an order affirming the judges' decisions. In that order, we promised that we would issue an opinion more fully explaining our reasoning.

## BACKGROUND

¶5    The State has charged Richins with aggravated murder, attempted aggravated murder, insurance fraud, mortgage fraud,

and forgery. When we heard argument, a four-week jury trial was set to begin in April 2025 in Summit County.[1]

¶6    According to an order the Trial Judge signed, Richins's case has received "extreme media attention." "Hearings in this matter are consistently covered by a pool videographer (*i.e.*, a TV camera is in the courtroom), a pool photographer (typically from the Associated Press), multiple print and radio journalists, and multiple TV producers." This attention "consistently yields coverage in local, national, and international print, television, and online media." "Beyond legacy media, this matter is consistently covered by 'new media' outlets such as multiple YouTube channels with between *800,000 and 1.5 million subscribers each*." Moreover, "on days on which the [trial] court holds hearings in this matter, the courthouse appears and feels overrun."

¶7    The Parties made two stipulated requests related to Richins's trial. They first requested that jury selection be held in person, rather than over Webex, a video conferencing platform.[2] They next moved to expand the jury venire to include prospective jurors from Summit and Salt Lake counties.

¶8    The Parties made their first request pursuant to a Third District standing order that, since September 26, 2023, directs all jury selections in the Third District to be conducted virtually (Standing Order). If the Presiding Judge determines that "extraordinary circumstances" exist, she can grant a variance and permit in-person jury selection.

¶9    The Third District adopted the Standing Order after considering several factors, including "the number of judges, the volume of jury trials, the . . . backlog of jury trials, the limited number of in-person jury selections that could be conducted each

---

[1] Summit County, along with Salt Lake and Tooele counties, compose Utah's Third Judicial District.

[2] We use the term "jury selection" to include voir dire. *See generally Selected to Serve: A Guide to Jury Service*, UTAH STATE CTS., https://www.utcourts.gov/en/about/courts/dist/jury/sel-serve .html#SectionII (last visited Apr. 16, 2025).

week given available . . . resources, the bailiff shortage, the way criminal jury trials are stacked, and the impact on jurors."[3]

¶10 Although the Standing Order does not contemplate having a trial court judge decide the jury-selection question, the Trial Judge issued an order approving the Parties' request for in-person jury selection and concluding that "the extreme media attention focused on this matter is an extraordinary circumstance." He then referred the "matter" to the Presiding Judge for "approval or rejection" of the stipulated motion.

¶11 In the order, the Trial Judge also approved the Parties' second request: to expand the jury venire to include prospective jurors from Summit and Salt Lake counties.

¶12 The Presiding Judge then issued an order, in which she denied the request to conduct jury selection in person. She agreed that "this is a 'high-profile case.'" But she concluded that the Parties failed to "demonstrate[] that this is an *extraordinary* case." (Emphasis added.)

¶13 She reasoned that the Parties' concerns about "cameras and the number of people in and around the courtroom during a trial" could be addressed "with carefully crafted jury questionnaires, jury instructions, and decorum orders." She explained that the Parties failed to adequately explain why in-person jury selection was needed "to address general concerns about 'extreme media attention' or why the use of a supplemental or case-specific questionnaire coupled with meticulous questioning during voir dire would be insufficient for identifying those jurors who may be uncomfortable with media attention or large crowds."

¶14 In that order, the Presiding Judge also commented on the Parties' second request. She wrote that "the Parties apparently have 'stipulated' to 'expanding' the jury venire to include 'equal numbers of randomly selected jurors from Summit County and Salt Lake County.'" She explained that she was not "commenting on whether this is permissible under Utah law," but that she was "not persuaded that any minimal benefit from 'exposing' potential

---

[3] The Presiding Judge's brief represents that "[t]he Standing Order was drafted and enacted in consultation with, and the unanimous agreement of, the administrative management committee, which [the Trial Judge] serves on. It was also extensively discussed with the Third District bench."

jurors to the 'palpable changes in energy in the courtroom' outweighs the significant and unwarranted burden on dozens of prospective jurors from Salt Lake County who otherwise would be forced to travel to Summit County for in-person jury selection." Following her reference to "Utah law," the Presiding Judge included, without additional comment, a footnote citing Utah Code section 78B-1-105. Subsection 78B-1-105(1) states that a "person is competent to serve as a juror if the person is . . . a resident of the county." UTAH CODE § 78B-1-105(1)(c).

¶15 This prompted the Trial Judge to issue an order reconsidering the Parties' motion to expand the jury venire. He set aside his previous order granting the motion and, this time, denied it. He gave two reasons for his volte-face. He first explained that the Presiding Judge had rejected the request. He next concluded that Utah law did not permit jurors to be summoned from multiple counties for one trial.

¶16 The Parties filed petitions for permission to appeal the Presiding Judge's order and the Trial Judge's reconsidered order in this court, which we granted.[4] We invited the Administrative Office of the Courts (AOC) to file an *amicus curiae* brief on the issues pertaining to the Standing Order regarding in-person jury selection. The AOC declined that invitation and instead submitted an amicus brief on behalf of the Presiding Judge. Although this was different from what we had authorized, the Parties did not oppose the Presiding Judge's participation. We accepted the amicus brief.[5]

---

[4] The Parties also filed two joint petitions for extraordinary relief. We denied them, concluding that an interlocutory appeal supplied the Parties with an adequate remedy.

[5] We pause to note that we see this as an anomalous situation. We do not normally allow the judges whose decisions we review to file briefs explaining why they ruled the way they did. We trust Utah's judges to explain their reasoning in the orders they issue, and we expect appellees to defend those decisions on appeal. We invited the AOC to submit a brief because we believed that that administrative body might be able to explain the rationale behind the Standing Order and the policy considerations that prompted an exception for "extraordinary circumstances." But here, because the Parties were aligned in their opposition to the Presiding Judge's decision (leaving no one to defend it), and because the Presiding

(continued . . .)

¶17 We heard argument on February 11, 2025. Because the Parties stressed the need for an expeditious answer to their appeal, we issued a brief order stating that we affirmed both decisions. This opinion more thoroughly explains the basis for that determination.

## ISSUES AND STANDARDS OF REVIEW

¶18 The Parties first challenge the Presiding Judge's order denying their stipulated request for in-person jury selection. We review that decision for abuse of discretion. *See Hi-Country Ests. Homeowners Ass'n v. Bagley & Co.*, 2000 UT 27, ¶¶ 11, 14, 996 P.2d 534. A district court abuses its discretion if it applies the wrong legal standard or if its decision is "beyond the limits of reasonability." *State v. Green*, 2023 UT 10, ¶ 43, 532 P.3d 930 (cleaned up). A district court's decision is "beyond the limits of reasonability," *id.* (cleaned up), if "no reasonable person would take the view adopted by the trial court," *State v. Montiel*, 2005 UT 48, ¶ 24, 122 P.3d 571 (cleaned up).

¶19 The Parties next contend that the Trial Judge erred when he ultimately denied the stipulated motion to expand the jury venire to include prospective jurors from Summit and Salt Lake counties. We review decisions related to the district court's management of jury selection for abuse of discretion. *See Boyle v. Christensen*, 2011 UT 20, ¶ 9, 251 P.3d 810 (stating that for "challenges to the trial court's management of jury voir dire, an abuse of discretion standard [i]s appropriate"). "Misapplication of the law constitutes an abuse of discretion." *Utah v. Boyden,* 2019 UT 11, ¶ 19, 441 P.3d 737. "For that reason, when a legal conclusion is embedded in a district court's discretionary determination, we peel back the abuse of discretion standard and look to make sure that the court applied the correct law." *Id.* ¶ 21.

## ANALYSIS

I.   WE HAVE JURISDICTION TO REVIEW THE PRESIDING JUDGE'S ORDER

¶20 Before we turn to the Parties' arguments, we need to address the Presiding Judge's assertion that it is "not clear whether the parties are entitled to" any appellate review of her decision. She asserts that her decision is "purely administrative," and the parties "are not challenging the Standing Order itself or the authority granted to the presiding judge under it." She argues that nothing

_____

Judge questioned our jurisdiction to hear the matter, we accepted the amicus brief.

in Utah Code section 78A-3-102, our jurisdiction statute, "appears to invoke jurisdiction over *an administrative decision* by a Presiding Judge."[6] (Emphasis added.) In other words, the Presiding Judge politely suggests that this court lacks the ability to review her administrative decision by way of an appeal.[7]

¶21 This argument is pure inside baseball.[8] It speaks to a division of authority in Utah's judiciary that is not always apparent to even the most experienced attorneys and judges.

¶22 Our constitution has created a "Judicial Council[,] which . . . adopt[s] rules for the administration of the courts of the state."

---

[6] Although we conclude that we need not decide whether the Presiding Judge's decision is administrative or procedural to resolve this appeal, we note that the Presiding Judge has raised an interesting point. Indeed, if her decision is purely administrative, an appeal may not be the proper course. Rule 3-104(3)(A)(iii) of the Utah Code of Judicial Administration provides that "[a]ny judge of the judicial district may ask the Chief Justice or Judicial Council to review any administrative decision made by the presiding judge of that district." But whether that rule is better considered an exhaustion requirement, or an exclusive remedy, is beyond the scope of this opinion.

[7] We do not read anything in the Presiding Judge's argument to suggest that a party could not seek an extraordinary writ to advance an argument about her ruling.

[8] William Safire described inside baseball's "political or professional denotation" as "minutiae savored by the cognoscenti, delicious details, nuances discussed and dissected by aficionados." William Safire, *On Language; Inside Baseball*, N.Y. TIMES MAG. (June 19, 1988), https://www.nytimes.com/1988/06/19/magazine/on-language-inside-baseball.html. This is not to suggest that the question is unimportant. To the contrary, a lot can ride on the distinction between an administrative or procedural rule: whether a party must exhaust administrative remedies or whether a party can seek direct review, for example. The question also has a constitutional dimension. The Utah Constitution gives the Utah Legislature the ability to amend Supreme Court rules of procedure and evidence by a supermajority vote of each house. *See* UTAH CONST. art. VIII, § 4. That provision does not apply to the Judicial Council's administrative rules.

UTAH CONST. art VIII, § 12(1). The Utah Constitution separately gives the Supreme Court the authority to "adopt rules of procedure and evidence to be used in the courts of the state." *Id.* art. VIII, § 4. It is not always easy to define the line that demarcates these powers.

¶23 The Judicial Council has promulgated a Code of Judicial Administration that contains the rules that govern the court system's administration. Rule 3-105(3)(A) of the Utah Code of Judicial Administration, for instance, gives the Judicial Council "exclusive authority for the administration of the judiciary, including authority to establish and manage the budget, adopt administrative policies and rules, and oversee the Administrative Office of the Courts."

¶24 The Judicial Council's administrative rules largely concern day-to-day operations of our courts. *See generally* UTAH R. JUD. ADMIN. 3-101 to -502; *id.* R. 4-101 to -908. Such rules, to highlight a few, address human resource policies, procurement rules, and court facilities planning. *See id.* R. 3-402; *id.* R. 3-412; *id.* R. 3-409.

¶25 The administrative rules also include a provision for jury selection. *See id.* R. 4-404. Rule 4-404 mandates how courts will compile the master jury list, establishes random selection procedures for who will be called to jury duty, and directs how prospective jurors are summoned to service.

¶26 Our procedural rules dictate, among other things, how court proceedings unfold. The Utah Rules of Criminal Procedure, for example, set standards for the appointment of counsel, outline how a subpoena issues, and describe how a jury should be instructed. *See* UTAH. R. CRIM. P. 8; *id.* R. 14; *id.* R. 19.

¶27 These rules also speak to how a jury is to be selected. They outline different methods through which parties may examine and challenge prospective jurors. *See id.* R. 18. The rules also limn the discretion a court possesses "to set a hearing as an in-person hearing, a remote hearing, or a hybrid hearing" and provides factors for the court to consider to determine which format to use for a hearing in a particular case. *See id.* R. 17.5(b).

¶28 While it may constitute an oversimplification that fails to account for the cases that exist close to the line, we can at least take note of a general observation when it comes to distinguishing administrative from procedural rules. Administrative rules tend to describe what occurs behind the door that separates the courtroom

from judges' chambers and the administrative offices of the court. Procedural rules tend to govern what happens in front of that door.

¶29 In her brief, the Presiding Judge relies on a provision of the Utah Code to argue that her decision denying in-person jury selection is administrative. Utah Code subsection 78A-5-106(5) gives presiding judges authority to "implement[] policies of the Judicial Council" and "exercis[e] powers and perform[] administrative duties as authorized by the Judicial Council." True enough. But that does not really tell us anything about the scope of what should be properly considered administrative.

¶30 The Presiding Judge also relies on several rules from the Utah Code of Judicial Administration. Rule 3-104(3)(A)(i) charges presiding judges "with the responsibility for the effective operation of the court," including the implementation and enforcement of "statutes, rules, policies and directives of the [Judicial] Council as they pertain to the administration of the courts." Yet this similarly tells us nothing about the line between administrative and procedural rules.[9]

¶31 Rule 4-404 of the Utah Code of Judicial Administration is a little more helpful. That rule provides that the jury summons "may direct the prospective juror to appear at a date, time, and place certain." UTAH R. JUD. ADMIN. 4-404(6)(C)(ii). The Presiding Judge argues that the authority to summon a prospective juror to a place certain includes the authority to summon them to a virtual place.[10]

---

[9] We would also caution against drawing too many lessons about what is procedural and what is administrative from a review of the Utah Code of Judicial Administration. That could lull a reader into thinking that those rules were adopted with the procedural/administrative distinction well in mind. This, to borrow a phrase, may assume facts not in evidence.

[10] The Presiding Judge additionally claims that in our COVID-19-related orders, we amended rule 18 of the Utah Rules of Criminal Procedure to require virtual jury selection. (Citing ORDER FOR COURT OPERATIONS DURING PANDEMIC, UTAH SUP. CT. & UTAH JUD. COUNCIL (Mar. 13, 2020), https://www.utcourts.gov /content/dam/alerts/docs/20200311%20-%20Pandemic%20Adm inistrative%20Order.pdf.) We assume that the Presiding Judge is

(continued . . .)

¶32 At first blush, the question of when a party can seek in-person jury selection resembles the topics covered in rule 17.5 and rule 18 of the Utah Rules of Criminal Procedure much more than the internal processes for sending out jury questionnaires and summonses that rule 4-404 of the Utah Code of Judicial Administration describes. This would suggest that the question of when jury selection may be held virtually is more properly the subject of a procedural rule.

¶33 As interesting as the question might be, we ultimately need not resolve it to determine whether we have jurisdiction over this appeal. This is because the Presiding Judge entered an order in the case denying the Parties' request. And, under our precedent, that order secures our appellate jurisdiction.

¶34 In *Hi-Country Estates Homeowners Ass'n v. Bagley & Co.*, we were asked to review a presiding judge's decision to reassign a matter to another judge. 2000 UT 27, ¶ 1, 996 P.2d 534. There, the presiding judge issued a minute entry reassigning the case. *Id.* ¶ 9. We construed the minute entry as an "order" and exercised jurisdiction over it under Utah Code section 78-2-2(3)(j) (1996) even though the decision fell within the presiding judge's administrative capacity under rule 3-104 of the Utah Code of Judicial

---

referring to the instruction applicable to all court levels that "[i]f a jury trial is conducted . . . the court should implement jury selection processes that protect the health and safety of the individuals who might be called for jury duty." *See id.* She might also be referring to our order dated December 31, 2020. In that order, issued when COVID-19's spread was accelerating, we instructed courts to conduct jury selection remotely. *See* ADMINISTRATIVE ORDER FOR COURT OPERATIONS DURING PANDEMIC, UTAH SUP. CT. & UTAH JUD. COUNCIL (Dec. 31, 2020), https://www.utcourts.gov/content/dam /alerts/docs/20201231%20-%20Pandemic%20Administrative%20 Order.pdf.

These orders, which were promulgated in the rush and fog of the pandemic response, were issued jointly by the Utah Supreme Court and the Judicial Council. We acted jointly in part so we would not have to sort out which body had the ability to do what during such a critical time. In light of that history, these orders are not terribly instructive on the question of how to discern administrative from procedural rules.

Administration.[11] *See Hi-Country*, 2000 UT 27, ¶¶ 9, 11; *see also id.* ¶ 19 (Anderson, J., dissenting). We rejected the dissent's argument that we lacked jurisdiction "because such administrative acts of the presiding judge do not constitute appealable orders."[12] *Id.* ¶ 13 (majority opinion).

¶35 We similarly have jurisdiction to review the Presiding Judge's decision denying the Parties' request for in-person jury selection even if the decision is characterized as falling within her administrative capacity. *See id.* ¶¶ 11, 13–14. Under the logic of *Hi-Country*, once the Presiding Judge turned what might have been an internal administrative decision into an order entered in the case, it became appealable like any other order. We undoubtedly have jurisdiction over "interlocutory appeals from any court of record involving a charge of a first degree or capital felony." UTAH CODE § 78A-3-102(3)(h).

¶36 Before we move on to the substance of the Parties' challenges, it is important to note what the Parties do not argue. The Parties have not raised on appeal the question of whether the

---

[11] That rule "grants authority to the presiding judge to make initial case assignments and to reassign cases when necessary." *Hi-Country*, 2000 UT 27, ¶ 14. At the time, rule 3-104(3)(E) instructed that: (1) the "presiding judge shall monitor the status of the dockets in the court and implement improved methods and systems of managing dockets," and (2) "[t]he presiding judge shall assign cases and judges in accordance with supplemental court rules to provide for an equitable distribution of the workload and the prompt disposition of cases." UTAH R. JUD. ADMIN. 3-104(3)(E)(i), (ii) (2000). Similar provisions can be found in rule 3-104 as it exists today, but presiding judge "[d]ocket management and case and judge assignment[]" responsibilities have since been renumbered as rule 3-104(3)(F). *See id.* R. 3-104(3)(F).

[12] We also explained that "this court is entrusted with the authority to supervise and oversee the administration of the lower courts of this state, including administrative rules or procedures governing the transfer of a case from one judge to another." *Hi-Country*, 2000 UT 27, ¶ 13. The Presiding Judge has not challenged this precedent, and we do not revisit it here. We note, however, that our blurring of administrative and procedural rules in this statement might render it less than analytically robust.

failure to allow in-person jury selection violates any right the federal or state constitution protects. Nor do they argue that the Presiding Judge lacked the authority to enter the Standing Order.[13] This leaves us with the questions of whether the Presiding Judge abused her discretion when she denied the Parties' request for in-person jury selection and whether the Trial Judge abused his discretion when he rejected the Parties' entreaty to pull jurors from more than one county.

## II. THE PRESIDING JUDGE DID NOT ABUSE HER DISCRETION WHEN SHE DENIED THE PARTIES' STIPULATED REQUEST FOR IN-PERSON JURY SELECTION

¶37 The Parties first contend that the Presiding Judge abused her discretion when she failed to defer to the Trial Judge's finding and conclusion that "the extreme media attention focused on this matter is an extraordinary circumstance justifying in-person jury selection." They maintain that the Presiding Judge should have deferred to the Trial Judge's findings about the media presence in this case and its effect on jury selection, as well as the Trial Judge's ultimate finding of extraordinary circumstances.

¶38 This argument fundamentally misunderstands the process the Third District has implemented to govern requests for in-person jury selection. The Standing Order directs that all jury selection in the Third District "will be conducted virtually" "absent extraordinary circumstances and prior approval from the Presiding Judge." The requirement that the Presiding Judge approve any request for in-person jury selection vests the authority to decide whether any jury selection should depart from the norm in the

---

[13] The closest the Parties come to challenging the Presiding Judge's authority can be found in their reply brief. They cite rule 17.5 and rule 18 of the Utah Rules of Criminal Procedure and argue that these rules demonstrate that jury selection is a matter of procedure and not administration. Neither rule speaks squarely to whether the Presiding Judge has the authority to order that jury selection be presumptively virtual. Rule 17.5 governs hearings. Rule 18 discusses jury selection *methods* but is silent on the question of jury-selection *format*. And, as we have discussed, the line between procedural and administrative rules can be difficult to define, and the Parties have not really tried to define it. The Parties, at bottom, have not carried their burden of demonstrating that the Presiding Judge lacked the authority to enter the Standing Order.

Presiding Judge alone. Nothing in the Standing Order requires or indeed permits a trial court judge to decide in the first instance whether "extraordinary circumstances" exist.

¶39 The Trial Judge appeared to understand that the decision to conduct jury selection in person rested with the Presiding Judge. In his order, the Trial Judge referred the "matter" to the Presiding Judge "for approval or rejection of" the stipulated motion. As such, the Presiding Judge was not reviewing the Trial Judge's findings or his ultimate conclusion. She therefore owed his order no deference.

¶40 The Parties read the Standing Order differently than we do. They claim that its plain language does not provide that the Presiding Judge will determine whether extraordinary circumstances exist. They point to the Standing Order's use of the conjunction "and" in the following pronouncement: "absent extraordinary circumstances *and* prior approval from the presiding judge, all jury selections in the Third District Court will be conducted virtually." (Emphasis added.) They claim that "[w]ith that conjunction, the Standing Order identifies the approval of the presiding judge as an *additional* requirement to the finding of extraordinary circumstances" by the trial court judge.

¶41 But just as the Standing Order's plain language does not give the Presiding Judge explicit authority to determine whether extraordinary circumstances exist in a particular case, it fails to give the trial court judge that same authority. The best reading of the Standing Order is that both determinations are vested in the Presiding Judge, whose "prior approval" is the linchpin. In other words, the Presiding Judge needs to be convinced that extraordinary circumstances exist as a prerequisite to granting approval.

¶42 The Parties also assert several reasons why a trial court judge, rather than the Presiding Judge, should make a finding about whether extraordinary circumstances exist in a particular case. The Parties maintain that "to allow the presiding judge to evaluate and make findings in an individual case to which she has not been assigned is inconsistent" with a presiding judge's role in "handling district-wide policy and administrative matters" under Utah Code subsection 78A-5-106(5) and rule 3-104(3) of the Utah Code of Judicial Administration. They also point to rule 29 of the Utah Rules of Criminal Procedure and rule 63 of the Utah Rules of Civil Procedure, which give specific authority to "the presiding judge of the court" when parties have moved to disqualify a judge

and note "the absence of any such authority in the rules for the presiding judge to make factual findings regarding whether in-person voir dire or jury selection is appropriate in another judge's case." The Parties also note that a trial court judge is better positioned to observe the atmosphere in and around the courtroom and that these circumstances may not be adequately reflected in the record. Additionally, the Parties claim that jury selection is a judicial function that should be handled by a case's assigned judge.

¶43 We completely understand the Parties' position that it might be good policy to leave the decision to conduct in-person jury selection to trial court judges. But even if we were inclined to agree that the reasons to permit a trial court judge to decide which format is best for a particular trial are more compelling than the Standing Order's justifications for placing the decision with the Presiding Judge, it would not change that, here, the Standing Order takes that decision away from trial court judges and gives it to the Presiding Judge.[14]

¶44 The Parties next contend that the Presiding Judge abused her discretion when she concluded that the Parties had not shown "extraordinary circumstances" that would justify departing from the Third District's general practice of conducting jury selection virtually. They argue that "it is beyond the limits of reasonability to forbid in-person jury selection under the facts and circumstances here." Specifically, this is "an unusual case involving an aggravated murder charge, with a jury trial scheduled to last a full month, and the boots on the ground—both parties and the trial judge—all

---

[14] The Parties also argue that to determine what "extraordinary circumstances" meant, the Presiding Judge "looked to case law addressing the exceptional circumstances exception to the appellate doctrine of preservation, which is to be used 'sparingly' and in cases of 'manifest injustice.'" (Quoting *State v. Nelson-Waggoner*, 2004 UT 29, ¶ 23, 94 P.3d 186.) They claim that "preservation doctrines are not applicable to this preserved issue." We agree with the Parties that our preservation doctrine has little bearing on what the Standing Order means when it uses the phrase "extraordinary circumstances." But this is ultimately of no matter because the Standing Order vests the Presiding Judge with discretion to determine what constitutes an extraordinary circumstance. And the Parties have not shown an abuse of that discretion under any plausible definition.

agreeing that in-person voir dire and jury selection would be best, given the intense media presence and publicity."

¶45 While reasonable minds could differ on the benefits of departing from the Third District's general practice in this case, we cannot say that the Presiding Judge's decision fell outside the bounds of reasonability. A judge's decision is beyond the limits of reasonability only if no reasonable person would take the view the judge adopted. *See State v. Montiel*, 2005 UT 48, ¶ 24, 122 P.3d 571.

¶46 In her order, the Presiding Judge acknowledged that there was "no question this is a 'high-profile case' being covered by traditional and 'new media,'" but she explained that there were "many such cases in Third District Court." The Presiding Judge reasoned that, "as has been done in several other cases, issues regarding cameras and the number of people in and around the courtroom during a trial can be addressed with carefully crafted jury questionnaires, jury instructions, and decorum orders."

¶47 The Presiding Judge concluded that the Parties failed to "adequately explain why in-person jury selection is needed to address general concerns about 'extreme media attention'" or "why the use of a supplemental or case-specific questionnaire coupled with meticulous questioning during voir dire would be insufficient for identifying those jurors who may be uncomfortable with media attention or large crowds." The Presiding Judge reasoned that the Parties also failed to explain how they intended to "'expose' the prospective jurors to the media and large crowds without compromising privacy of the prospective jurors or the safe environment needed to answer personal questions truthfully and free from any pressure to conform to perceived judicial or community standards."

¶48 The Presiding Judge also cited an online editorial that states that jury selection in high-profile cases is experiencing a "significant trend" in "the shift towards virtual jury selection processes." (Citing *Jury Selection in High-Profile Cases: An In-Depth Analysis*, LAWS LEARNED (July 8, 2024), https://lawslearned.com/jury-selection-in-high-profile-cases/.) She cited the same editorial for the proposition that "[r]emote voir dire sessions may enhance accessibility and allow for a broader jury pool, thus enriching the diversity of jurors." Remote jury selection also "aid[s] in mitigating public exposure, especially in high-profile cases where media attention can influence jurors."

¶49 In other words, the Presiding Judge provided multiple reasons why she believed that this matter did not present extraordinary circumstances. The Parties have not demonstrated that the Presiding Judge's decision is one that no reasonable person would adopt. The Presiding Judge did not abuse her discretion, and we affirm her order.

## III. THE TRIAL JUDGE DID NOT ABUSE HIS DISCRETION WHEN HE DENIED THE PARTIES' STIPULATED REQUEST TO EXPAND THE JURY VENIRE

¶50 The Parties also contend that the Trial Judge abused his discretion when he denied the Parties' motion to expand the venire to include prospective jurors from Summit and Salt Lake counties. The Trial Judge initially issued an order granting that request. After he entered that order, the Presiding Judge, in the order denying the motion for in-person jury selection, acknowledged that the Parties had stipulated to an expanded venire. She then opined, "[w]ithout commenting on whether this is permissible under Utah law," that she was not persuaded that this was a reason to allow in-person jury selection. In a footnote, the Presiding Judge cited Utah Code section 78B-1-105, which directs, among other things, that "[a] person is competent to serve as a juror if the person is . . . a resident of the county." UTAH CODE § 78B-1-105(1)(c).

¶51 The Trial Judge construed the Presiding Judge's statement as a rejection of the Parties' second stipulated request. This motivated him to reconsider his order allowing an expanded venire. In addition to referencing the Presiding Judge's rejection as a reason for his reconsidered decision, the Trial Judge also concluded that "while a district court may summon jurors from an adjacent county," Utah law does not allow the court to "summon jurors from multiple counties for one trial." (Citing *State v. Nielsen*, 2014 UT 10, 326 P.3d 645; UTAH CODE § 78B-1-103(1)(a); *id.* § 78B-1-105(1)(c); *id.* § 78B-1-107(2).)

¶52 The Parties argue that the Trial Judge erred for three reasons. They first claim that it was plain error for the Trial Judge to conclude that the Presiding Judge had the authority to countermand his decision to expand the venire. The Parties next assert that he misinterpreted Utah law to prohibit summoning jurors from multiple counties when the Parties stipulated to do so. They lastly maintain that the Trial Judge's decision to decline to expand the venire was outside the bounds of reasonability.

¶53 We agree that the Trial Judge erred when he concluded that the Presiding Judge rejected the request to call prospective jurors from Summit County and Salt Lake County. But this error was ultimately harmless because the Trial Judge correctly concluded that he lacked the statutory authority to expand the venire based on the Parties' stipulation.

¶54 The Trial Judge incorrectly concluded that the Presiding Judge rejected the Parties' stipulated request to expand the jury venire. In her order denying the Parties' request for in-person jury selection, the Presiding Judge observed that "the parties apparently have 'stipulated' to 'expanding' the jury venire to include 'equal numbers of randomly selected jurors from Summit County and Salt Lake County.'" She wrote, "Without commenting on whether this is permissible under Utah law, I am not persuaded that any minimal benefit from" in-person jury selection "outweighs the significant and unwarranted burden on dozens of prospective jurors from Salt Lake County who otherwise would be forced to travel to Summit County for in-person jury selection."

¶55 The Presiding Judge certainly expressed skepticism about the Parties' stipulation to expand the jury venire, but she did not reject the request. To the extent the Trial Judge interpreted this as the Presiding Judge overruling his decision, rather than pointing out the precarious legal foundation on which the decision stood, he erred.

¶56 But this error was harmless because the Trial Judge correctly determined that Utah law—namely, the Jury and Witness Act (the Act)—prohibits the summoning of prospective jurors from two counties for trial. Several provisions in the Act evince a legislative intent that jurors be called from a single county—that is, the county in which the trial is to be held. Utah Code subsection 78B-1-102(3), for instance, defines "jury" as "a body of persons temporarily selected from the citizens of a particular county." Subsection 78B-1-103(1)(a) states that it "is the policy of this state that . . . persons selected for jury service be selected at random from a fair cross section of the population of the county." And subsection 78B-1-107(2) directs that prospective jurors "be randomly selected from the county in which the trial will be held." Such specific references warrant one conclusion: the Legislature intended that the jury pool for trial be composed of jurors from a single county.

¶57 The Parties urge us to conclude otherwise, first arguing that under Utah Code subsection 68-3-12(1), the Legislature has

advised that when interpreting "a statute in the Utah Code, . . . [t]he singular includes the plural, and the plural includes the singular." *Id.* § 68-3-12(1)(a), (b). The Parties maintain that we should follow this instruction and read the word "county" as "counties." But this argument omits the Legislature's instruction that "the general rules" in Utah Code subsection 68-3-12(1) "shall be observed, unless the construction would be: (i) inconsistent with the manifest intent of the Legislature; or (ii) repugnant to the context of the statute." *Id.* § 68-3-12(1)(a).

¶58 In light of the Legislature's repeated references to a single county, and its inclusion of qualifiers like "particular" and "in which the trial will be held," construing "county" as "counties" in the relevant provisions would be "inconsistent with the manifest" legislative intent. *See id.* § 68-3-12(1)(a)(i); *id.* § 78B-1-102(3); *id.* § 78B-1-103(1)(a); *id.* § 78B-1-107(2). This is especially true in the context of Utah Code subsection 78B-1-107(2)'s requirement that prospective jurors "be randomly selected from the county in which the trial will be held," as a trial cannot take place in more than one county.

¶59 The Parties also claim that because Utah law allows a criminal defendant to be tried by jurors from a county other than the one in which the trial is held, prospective jurors from multiple counties may be summoned for one trial. We disagree. Importantly, there is a difference between summoning jurors from a county other than the one in which the trial will be held and summoning jurors from two counties for one trial.

¶60 The Parties first assert that Richins may "be tried by a jury that includes jurors from Salt Lake County, which is in the same judicial *district*" as Summit County. (Emphasis added.) They rely on our state constitution, which gives a criminal defendant the right "to have a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed." UTAH CONST. art. I, § 12. Even if we assume that the constitutional reference to "district" refers to judicial districts, the Parties do not explain why the Legislature cannot, as it appears to have done in the Act, create a system where juries are selected from the county in which the offense is alleged to have been committed and not from the judicial district as a whole. The constitution describes the right to an impartial jury from the county *or* district. Moreover, the Parties have not argued that the Utah Constitution

gives Richins a right to have her jurors summoned from the entire district.

¶61 The Parties next direct us to rule 29 of the Utah Rules of Criminal Procedure. That rule allows a party who "believes that a fair and impartial trial cannot be had in the court location or in the county where the action is pending" to "move to have the trial of the case take place with a jury from another county." UTAH R. CRIM. P. 29(c)(1)(A). According to the Parties, this supports the conclusion that jurors from multiple counties may be summoned to serve in this case. But it does not follow from the rule's text that summoning jurors from multiple counties for one trial is permissible. The rule instead allows parties to have their case tried by a jury from *another* county if certain circumstances are present. At the time we issued our order in this case, no party had made such a request.

¶62 The Parties next reference Utah Code subsection 78B-1-119(1)(b), which states that "[e]very juror and witness . . . traveling more than 50 miles" is entitled to "$1 for each four miles in excess of 50 miles actually and necessarily traveled in going only, regardless of county lines." The Parties contend that this provision would be unnecessary if no jurors ever crossed county lines. We do not read the statute the same way.

¶63 This section governs fees and mileage for jurors *and* witnesses. *See* UTAH CODE § 78B-1-119. It is not difficult to envision situations in which trial witnesses must cross county lines. Yet even if this provision applied exclusively to jurors, we must construe it in harmony with the statute's other provisions. We cannot use this general rule to set aside the more specific statutory provisions that speak to jurors coming from a single county. After all, "where there is an inconsistency between related statutory provisions, the specific provision controls over the general." *In re Adoption of M.A.*, 2024 UT 6, ¶ 14, 545 P.3d 241 (cleaned up).

¶64 The Parties also argue that controlling precedent supports their view. In *Nielsen*, we held that a district court did not abuse its discretion when it held a trial in one county, due to security and logistical concerns, but convened a jury from a venire composed of residents of a neighboring county to "minimize the risk of any potential bias." 2014 UT 10, ¶¶ 25–28.

¶65 There are two problems with this argument. First, nothing in *Nielsen* speaks directly to a district court's ability to do what the Parties asked the Trial Judge to do. The jurors in *Nielsen* were

selected from a single county, not two. More importantly, however, after we issued our decision in *Nielsen*, the Legislature amended the Act to direct that prospective "jurors shall be randomly selected from the county in which the trial will be held." *See* Judiciary Amendments, S.B. 169 § 10, 2017 Leg., Gen. Sess. (Utah 2017) (available at https://le.utah.gov/~2017/bills/static/sb0169.html) (codified at UTAH CODE § 78B-1-107(2)). This forecloses the Parties' argument.

¶66 Finally, the Parties argue that they can waive the statutory requirement that jurors be selected from the county in which the trial will be held. For support, they point to cases in which, they contend, this court permitted parties to waive non-jurisdictional requirements, including "the requirements of mandatory statutes." (Citing *ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.*, 2010 UT 65, ¶ 14 n.3, 245 P.3d 184; *In re M.H.*, 2014 UT 26, ¶ 32, 347 P.3d 368.) The Parties also note that the court of appeals has held that certain aspects of jury selection may be waived. (Citing *State v. Ellifritz*, 835 P.2d 170, 176 (Utah Ct. App. 1992) (concluding that the trial court did not err in utilizing a jury-selection method that deviated from the methods set forth in our rules of criminal procedure); *State v. Suarez*, 793 P.2d 934, 938 (Utah Ct. App. 1990) (upholding the trial court's decision to utilize unused jurors from other courtrooms in a departure from the Act).) And they emphasize the general principle that in some circumstances, a defendant can waive her constitutional rights. (Citing *Faretta v. California*, 422 U.S. 806 (1975) (right to counsel); *Adams v. United States ex rel. McCann*, 317 U.S. 269 (1942) (right to trial by jury); *Miranda v. Arizona*, 384 U.S. 436 (1966) (right against self-incrimination); *Barker v. Wingo*, 407 U.S. 514 (1972) (right to speedy trial).)

¶67 It is true that statutory and constitutional rights can be "subject to knowing and voluntary waiver." *In re M.H.*, 2014 UT 26, ¶ 32; *see also ASC Utah, Inc.*, 2010 UT 65, ¶ 14 n.3 (explaining that "waiver or estoppel may be found in the face of a mandatory statute" (cleaned up)); *United States v. Mezzanatto*, 513 U.S. 196, 203 (1995) (noting that there is "a background presumption that legal rights generally . . . are subject to waiver by voluntary agreement of the parties"). But the provisions the Parties seek to waive exist not only to protect the Parties' rights and interests but also to reduce the burdens the jury-selection process can impose on individual jurors. These provisions additionally exist to protect the integrity of the jury-selection system and provide courts and litigants with a fair, uniform, and predictable process. The Parties

20

have not persuaded us that they can waive such statutory requirements.

¶68 The Parties' waiver argument additionally relies on the Act's exclusive-remedy provision. *See* UTAH CODE § 78B-1-113. That provision sets forth an "exclusive means by which" parties in a criminal case "may challenge a jury on the ground that the jury was not selected in conformity with th[e] [A]ct." *Id.* § 78B-1-113(3). Specifically, within

> seven days after the moving party discovered, or by the exercise of diligence could have discovered the grounds therefore, and in any event before the trial jury is sworn to try the case, a party may move to stay the proceedings or to quash an indictment, or for other appropriate relief, on the ground of substantial failure to comply with this act in selecting a . . . trial jury.

*Id.* § 78B-1-113(1).

¶69 If the court determines that in selecting a jury "there has been a substantial failure to comply" with the Act and "it appears that actual and substantial injustice and prejudice has resulted or will result to a party in consequence of the failure, the court shall" grant appropriate relief. *Id.* § 78B-1-113(2).

¶70 The Parties assert that these provisions "indicate a procedure that, even if mandatory, is subject to waiver." But this argument is misplaced. The legal right that the Parties claim they are waiving—compliance with the Act's provisions—is distinguishable from the legal right the Act extends to parties to challenge a jury that has not been selected in conformity with the Act. These provisions do not permit parties to waive compliance with the Act before a jury is selected.

¶71 The Parties' argument that their "waiver does not constitute a substantial departure from the jury selection statute" is similarly unconvincing. The Parties have not pointed to any language in the Act directing or suggesting that parties can waive compliance with the Act, so long as doing so does not amount to a substantial departure from the Act. Nor could they, as the Act does not give parties a legal right to waive compliance with the Act before jury selection. Rather, if the court determines that "*in selecting . . . a trial jury* there has been a substantial failure to comply with th[e] [A]ct and it appears that actual and substantial injustice

and prejudice has resulted or will result to a party in consequence of the failure, the court shall" grant appropriate relief. *Id.* (emphasis added).

¶72   When we heard argument, Richins's criminal trial was set to be held in Summit County. The Act does not permit summoning prospective jurors from two counties. As a result, the Trial Judge acted within his discretion when he declined to expand the venire to include jurors from Summit and Salt Lake counties.

## CONCLUSION

¶73   The State and Richins argue that the Presiding Judge and the Trial Judge abused their discretion when they denied the Parties' stipulated requests to conduct jury selection for Richins's trial in person and to expand the venire to include jurors from Summit and Salt Lake counties. We disagree. The Presiding Judge operated within the discretion the Standing Order provides her when she concluded that this case presents no extraordinary circumstances to justify departure from the Third District's general practice of virtual jury selection. And the Trial Judge correctly interpreted Utah law to conclude that jurors must be selected from a single county. We affirm.